16271

STATE v. MASON
(56 S. E. (2d) 90)

*Mr. C. Yates Brown,* of Spartanburg, *for Appellant,*

*Mr. Samuel R. Watt, Solicitor,* of Spartanburg, *for Respondent.*

October 31, 1949.

OxNER, Justice.

Appellant, Broadus Mason, and his son, Boyce Lee Mason, were jointly indicted and tried for the murder of John Cantrell. The son was acquitted. Broadus Mason was found guilty of murder with recommendation to the mercy of the Court and sentenced to imprisonment for life. The questions to be determined on the appeal relate to the exclusion of certain evidence as to threats alleged to have been made by the deceased against appellant and to the Court's refusal to permit the attorney for appellant to cross-examine Boyce Lee Mason.

The homicide occurred about noon on Sunday, February 15, 1948. About 10:30 or 11:00 that morning, deceased, accompanied by Clarence Fowler and A. J. Fowler, brothers about 20 and 17 years of age, respectively, drove his Ford automobile to appellant's farm to hunt squirrels. This farm was located about a mile and a half from the residence of the deceased. All of the parties lived in the same community and knew one another well. The deceased married a first cousin of appellant. When the hunters arrived at appellant's farm, they parked the car and all three went down near a creek and commenced hunting. They had a double-barreled shotgun and an automatic pistol. The appellant, whose residence was located about half a mile away, heard the shooting and went to the scene. He told the hunters that they could not hunt on his place and requested them to leave. Appellant says

they refused to do so, commenced cursing and using vile epithets and that the deceased drew a pistol on him. After a brief argument, the hunters left to return to their car and appellant went across the field in an opposite direction toward his home. Appellant says as he was leaving, they cursed him and dared him to come back, which made him "mad". He went home where he secured a shotgun and then proceeded to the place where the car was parked. Meanwhile his son, Boyce Lee Mason, about 26 years of age, came home and as a result of a conversation with a younger brother, procured a rifle and followed his father.

When appellant arrived at the parked car, deceased was under the steering wheel, A. J. Fowler was sitting next to him and Clarence Fowler was on the back seat. Appellant's testimony as to what then transpired is as follows: He opened the door and told the hunters to "crank up and get going." He said he was mad. They replied that they did not have to go. He said: "Get on off. I don't want to have any trouble with you." Clarence Fowler, who was holding the shotgun, then pointed it toward him. About this time his son arrived and told Clarence Fowler to unload the gun. He did so and laid the gun on the back seat. After the hunters refused to leave, appellant hit the deceased twice across the breast with the shotgun which he had secured at his home. His son said "Don't shoot him", to which he replied, "I ain't going to." Appellant then punched or hit the deceased on the head and his gun went off. His son exclaimed, "Daddy, you killed him", and he replied: "I can't help it, I didn't aim to."

Appellant's son gave substantially the same version of the occurrence. According to the State's testimony, the car had been started and the hunters were backing to leave when appellant arrived. The Fowler boys denied that Clarence Fowler threatened appellant in any manner, stating that the gun which Clarence Fowler had was unloaded and lying on the back seat. They said Boyce Lee Mason opened the

door of the car and thereupon appellant shot the deceased without any provocation whatsoever.

Immediately after the shooting, the Fowler boys ran. Appellant's son got in the car and drove the deceased to a nearby farm house for aid. He and his father discovered in moving the deceased that his pistol was under his leg near his right hand. It seems to be conceded that at the time of the homicide, neither the appellant nor his son knew that the deceased was sitting on this pistol and there is no testimony tending to show that he made any effort to use it. Appellant's contention was that as he was punching or hitting the deceased with the gun to get him to leave, the deceased was accidentally shot. The autopsy disclosed that the load of shot entered the top of the deceased's forehead, resulting in instant death.

In the light of the foregoing brief résumé of facts leading up to the homicide, we shall now consider appellant's contention that the Court erroneously excluded certain testimony tending to show threats alleged to have been made by the deceased. It is conceded that appellant had never had any prior difficulty with deceased. In fact, appellant testified that they "never had any cross words in our lives until that day." There is testimony to the effect that in October, 1947, about four months prior to the homicide, during a Halloween Carnival at a local school of which appellant was a trustee, the Fowler boys were shooting firecrackers and that when they refused to leave the school grounds after being requested to do so by appellant and the principal of the school, appellant slapped A. J. Fowler; and that on that night and on several occasions thereafter, the Fowler boys made threats against appellant which were communicated to him. Several witnesses testified to this effect without objection. One of them was allowed to further state that after relating these threats to appellant, he warned appellant to "watch them boys, liable to give him some trouble."

When appellant took the stand, he was permitted to testify that threats had been communicated to him by one Louis

Bishop but the Court refused to allow him to testify "what the threats were" until it was first shown that such threats had actually been made. Appellant was then withdrawn as a witness, his counsel stating that "we are going to put up the witness who communicated the threats to the defendant." Thereafter Louis Bishop was called as a witness and asked whether he had communicated to appellant the threats which he had heard. The Solicitor objected and during the colloquy which followed it developed that this witness had never heard either the Fowler boys or the deceased make any threats and that his information as to such threats had been gained from persistent rumors in the community which he says he communicated to appellant with the warning that "he better look out". The Court sustained the Solicitor's objection and held that testimony along this line could not be admitted unless the witness had actually heard the threats made. Later during the trial appellant resumed the stand and gave the following testimony without objection:

"Q. State whether or not you had heard any threats communicated to you from those boys, that is, Clarence and A. J., before this stooting? A. Yes, sir.

"Q. Who had communicated those threats to you? A. John Nance, and Louis Bishop and Ben Horton."

It is well established under our decisions that where there is evidence in a homicide case tending to establish self-defense, both communicated and uncommunicated threats made by the deceased against the defendant are admissible, but for a different purpose. Uncommunicated threats are admissible to show the mental attitude of the deceased and are relevant on the question of who was probably the aggressor in the fatal difficulty, but may not be used to show the *quo animo* of the defendant. Previous threats of deceased communicated to the defendant are admissible to show the state of mind of the defendant, his belief of impending danger from the deceased, and to illustrate and explain his conduct and motives. *State v. Faile*, 43 S. C.

52, 20 S. E. 798. The substantive fact of the state of feeling entertained by the deceased toward a defendant may not be established by hearsay evidence. Before evidence as to uncommunicated threats is admissible, it must be proved that such threats were actually made by the deceased. It is held in some jurisdictions that in order to make communicated threats admissible for the purpose of showing the state of mind of the defendant and the reasonableness of his apprehension of violence at the hands of the deceased, it is not necessary to prove that they were in fact made by the deceased. In *Morris v. Territory,* 1 Okl. Crim. 617, 99 P. 760, 762, 101 P. 111, the Court said: "It is sufficient to prove that they were communicated to the defendant as having been made by the deceased under such circumstances, and coming from such a source, as would authorize a reasonable man, situated as the defendant then was, to honestly believe that such information was true." To the same effect is *Rogers v. State,* 8 Okl. Crim. 226, 127 P. 365. As bearing on the subject, also see *State v. Price,* 103 S. C. 277, 88 S. E. 295; *State v. Bowers et al.,* 122 S. C. 275, 115 S. E. 303; *State v. Williams,* 125 S. C. 385, 118 S. E. 783. The question is an interesting one but under the facts of this case, we find it unnecessary to pass upon it. Even assuming that it was proper to show that alleged threats of deceased against appellant were communicated to him without first establishing the fact that such threats had actually been made by the deceased, the rulings of the trial Judge were not prejudicial for two reasons.

(1) Appellant was permitted by several other witnesses to show the communication of threats made against him by the Fowler boys and that he had been warned to watch them. Subsequent to the rulings of the Court now complained of, appellant was permitted to testify without objection as to the communication of threats by the Fowler boys. They were the only ones with whom he seems to have had any previous difficulty. Appellant's testimony was to the effect that when

he complained of these three men hunting on his land, the deceased used vile epithets and drew a gun on him. All of this occurred within an hour of the homicide. According to his own testimony, he was under apprehension of danger when he went to his house to get his gun and proceeded to the car. It is difficult to see how evidence of any threats made against him by the deceased several months previously could have strengthened the belief of impending danger already entertained by appellant. In other words, the testimony excluded would have been merely cumulative and of inconsequential probative value for the purpose for which it was offered.

(2) Even if the deceased several months previously made threats against appellant, there is no testimony tending to show that at the time of the homicide he was about to carry his threats into execution. The record fails to show any hostile demonstration or overt act by the deceased after he returned to the car. No fair minded jury, honestly searching for the truth, could have concluded the issue of self-defense in favor of appellant.

The remaining question is whether the Court erred in not allowing appellant's attorney to cross-examine Boyce Lee Mason. A careful examination of the testimony given by this witness discloses nothing unfavorable or adverse to appellant's defense. On the contrary, the son's version of the occurrence was substantially in accord with that given by his father. Under these circumstances, there was no right of cross-examination. *State v. Hughey,* 214 S. C. 111, 51 S. E. (2d) 376. A different situation would have been presented if the testimony of the son had been opposed or contrary to the contention of appellant. *State v. Russ,* 208 S. C. 449, 38 S. E. (2d) 385. The suggestion was made in argument that appellant was also denied the right of direct examination. The Solicitor only objected to the right of cross-examination and although the record is not entirely clear, we think the Court's ruling was confined to

the question of the right of cross-examination. Be that as it may, appellant's exception imputes error only in being denied the right of cross-examination.

Judgment affirmed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.