STATE of Tennessee, Appellee,

v.

Olen "Eddie" HUTCHISON, Appellant.

Supreme Court of Tennessee,
at Knoxville.

June 6, 1994.

Rehearing Denied May 1, 1995.

Charles Burson, Atty. Gen. and Reporter, Rebecca L. Gundt, Asst. Atty. Gen., for appellee.

John Eldridge, Knoxville, Charlie Allen, Oneida, for appellant.

## OPINION

O'BRIEN, Justice.

On this direct appeal, we review the conviction and death sentence of the defendant, Olen "Eddie" Hutchison, for the first-degree murder of Hugh Huddleston. Hutchison was also convicted of conspiracy to take a life and solicitation to commit first-degree murder. The State's proof showed that he bought a large insurance policy on the victim's life, intending to hire others to kill the victim in order to collect the proceeds. The defendant was tried jointly with Chip Gaylor, the victim's trusted "friend," who conspired with Hutchison to lure the victim on a fishing trip so that others could drown him. On direct appeal, Hutchison challenges his conviction and death sentence. We uphold the trial court's judgment of conviction.

### I. Guilt Phase of Trial

The record establishes that the victim in this case, Hugh Huddleston, died by drowning while on a fishing trip at Norris Lake in Campbell County. The State's evidence showed that defendant Hutchison and several other men had conspired to kill Huddleston in order to collect almost $800,000 in life insurance proceeds and other benefits.

Huddleston, a bachelor in his mid-forties, had what was described by witnesses as a

father-son relationship with Hutchison's co-defendant, Chip Gaylor. In 1984, Huddleston made Gaylor, then 19, the sole beneficiary of his will, under which 95% of the estate would not pass to Gaylor immediately but would be held in trust for distribution to him at the ages of 25 and 30. Huddleston also made Gaylor the beneficiary of an insurance policy and other of his employment benefits, all of which amounted to over $289,000 in value.

The chief prosecution witness was Richard Miller, one of the conspirators and an acquaintance of the defendant and of Gaylor and Huddleston. He told how, during the year before Huddleston's death, he, the defendant, and Gaylor, then 26, were sitting around talking when the defendant mentioned "how much money he could make if he took insurance out on somebody and then had them killed." Gaylor remarked that he would pay the defendant $100,000 to kill someone but that his "insurance policy" was not good until he was 30. The defendant responded that that was too long to wait.

About a week later, the defendant asked Gaylor to have Huddleston sign some "insurance papers" under the pretense of a tax write-off. According to Miller, Huddleston would do almost anything Gaylor asked. Huddleston signed the papers, and that evening Miller and Gaylor returned them to the defendant, who indicated that he would get back in touch with them. Shortly afterward, the defendant had Gaylor get Huddleston's signature on a promissory note representing a fictitious debt of $25,000 to defendant. The insurance policy was to be security for the alleged debt. At Gaylor's prompting, Huddleston signed the note in Miller's presence, and Gaylor witnessed his signature. Two other men, M.C. Curnutt (an insurance agent and an alleged co-conspirator) and Charles Boruff, also signed as witnesses after the note's execution. The defendant also informed Gaylor that a nurse would be coming to perform a physical examination on Huddleston. The examination was performed, and an insurance policy was issued on Huddleston's life with $250,000 coverage—$500,000 in the event of accidental death. The defendant was the sole beneficiary of this policy and furnished the money with which the premiums were paid.

Once the "paper work" had been done, the defendant offered Gaylor $10,000 to kill Huddleston. Gaylor declined because he had an obvious motive. When Miller also refused to kill Huddleston, the defendant said he would get someone else. The defendant then spoke with Phil Varnadore, one of his "men,"[1] who agreed to "get his boys to do it" for $25,000 to $50,000. After initially discussing killing Huddleston on a hunting trip, the defendant and Varnadore decided to drown him during a fishing trip, since Huddleston could not swim. Wilbur Hatmaker was designated to be the killer. Hatmaker and Miller scouted out locations for the drowning on Norris Lake, and eventually a suitable spot was located. Hatmaker instructed Miller to have Huddleston there by 8:00 p.m. the next evening.

Gaylor arranged a fishing trip with Huddleston for that day, but only Miller showed up. The two men went to Norris Lake and rented a pontoon boat. Sometime after dark, Hatmaker and John Rollyson appeared in a separate boat. Acting on the pretense they were friends of Miller, the two joined Huddleston and Miller in fishing from the pontoon boat. According to plan, Miller left to get bait in another boat he had brought on the trip. Rollyson testified that after Miller left, Hatmaker pushed the victim into the water and wiped the boat with a rag. Hatmaker had promised Rollyson $12,500 for the killing, to be paid in 90 days. (The insurance policy provided for payment in 90 days.) When Miller returned to the boat, Huddleston was gone, as were Hatmaker and Rollyson. Miller reported Huddleston's disappearance and his body was discovered later that day in 15 feet of water. There were no obvious signs of violence on the body, but the pathologist later noted a deep bruise in the victim's scalp behind his right ear, which was apparently caused by a blunt object—possi-

1. Proof at trial tended to indicate the defendant ran a drug ring and that Miller and Varnadore were defendant's employees in the drug business.

bly from striking his head on the boat, or being struck by a boat paddle or a fist.

The defendant and Gaylor filed claims to collect the insurance. When the company refused to pay because of the district attorney's investigation into the circumstances of the victim's death, Gaylor sued the insurance company in federal court, claiming that Hutchison was responsible for Huddleston's death and should not be awarded the insurance proceeds. Hutchison then filed a cross-claim in the federal suit.

While the defendant was incarcerated on these charges, he wrote several letters to Miller and Varnadore communicating with them about the case and tacitly urging them to keep quiet. These letters were produced at trial. The defendant's cell mate, Keith Wilson, who had forwarded some of defendant's letters to Miller, testified that the defendant had told him that the others involved "knew better than to say anything" and that "[i]f they did, they would end up the same way as the other guy." The defendant had remarked that he had the money to get something done from jail and "all he had to do [was] make a phone call." He also said that "as long as everybody kept their mouth shut, then they would be found not-guilty, they couldn't prove nothing."

The defendant maintained that the $25,000 loan and subsequent use of the insurance policy as collateral had been a legitimate business deal between Huddleston and the defendant, who had loaned money to the victim in the past. The defendant, who testified, maintained his innocence of any involvement in Huddleston's death.

### A. *Sufficiency of the Proof*

The jury rejected the defendant's claim, finding him guilty of first-degree murder, conspiracy to take a life, and solicitation to commit first-degree murder. Despite the defendant's contention on appeal that the evidence is insufficient to support the jury's verdict, we find, to the contrary, that the proof is legally sufficient to support the convictions.

To corroborate the testimony of co-conspirators Miller and Rollyson, State investigators testified that in searching the defendant's home, they had found a recently purchased life insurance policy on Hugh Huddleston's life, naming the defendant as the sole beneficiary. The defendant had claimed, implausibly, to have been unaware of the policy. The accomplices' testimony was further corroborated by Hutchison's comments to his cell mate and his letters to Varnadore and Miller. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could readily have found the elements of the crimes charged beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### B. *Severance*

Hutchison alleges that the trial court erred by refusing to sever his trial from that of his co-defendant, Chip Gaylor. The court admitted evidence that Gaylor had sued in federal court to collect the proceeds from the victim's life insurance policy, and had labeled the defendant as the murderer in his complaint. The State introduced the complaint for identification during its cross-examination of Gaylor, in order to impeach his testimony that he knew nothing about the victim's death. Hutchison argues that the court's failure either to exclude the evidence or to sever his case prejudiced his defense.

Under Tenn.R.Crim.P. 14(c), a defendant may request severance if his co-defendant's out-of-court statement refers to the defendant, but is inadmissible against him. The trial court must either exclude the evidence or delete references to the defendant in order to hold a joint trial; otherwise, the court must sever the defendants' trials. A motion to sever is discretionary with the trial court, and the court's decision will not be reversed unless it clearly prejudiced the defendant. *State v. Coleman,* 619 S.W.2d 112, 116 (Tenn.1981).

In this case, Gaylor's complaint was admissible impeachment evidence against him, but inadmissible hearsay as to this defendant. Thus, the trial court should have excluded the complaint or severed the trials. Viewing the facts in light of the standard set

forth in *Coleman*, however, we conclude that the defendant was not unfairly prejudiced by the wrongful admission of the complaint. The complaint, filed long after Hutchison's indictment, cast blame for the murder on a known suspect, a likely person for anyone seeking insurance proceeds to blame. Thus, the complaint had little probative value regarding Hutchison's guilt. In addition, the substantive evidence at trial supported a finding of Hutchison's guilt beyond a reasonable doubt. We, therefore, do not believe that Hutchison was unfairly prejudiced by the admission of Gaylor's complaint and decline to reverse his conviction on this basis.

## C. *Voir dire*

■ The defendant also alleges that several errors on *voir dire* denied him his right to an impartial jury under the Sixth and Fourteenth Amendments of the United States Constitution, and also denied him his constitutional right to due process. First, he argues that the court's refusal to sequester jurors for questions about the death penalty, pretrial publicity, homosexuality, and illegal drug use allowed jurors to hear the answers that would enable them to escape jury service. In reviewing his claim, we observe that the trial court has much discretion in choosing the method of *voir dire*. Its authority to question jurors individually is permissive, not mandatory. *See* Tenn.R.Crim.P. 24(a); *Lang v. State*, 3 Tenn.Cr.App. 108, 113, 457 S.W.2d 882, 884 (1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Bouchard v. State*, 554 S.W.2d 654, 659 (1977). Absent a showing of prejudice, we have no basis on which to overturn the trial court's decision.[2] Hutchison has not shown that any juror was exposed to potentially prejudicial information,[3] and we, therefore, find no reversible error in connection with the court's decision in this regard.

■ The defendant's second allegation of error faults the trial court for not allowing defense counsel to rehabilitate jurors who stated that they could not impose the death penalty. Tenn.R.Crim.P. 24(b) gives the trial judge the right to excuse a juror for cause without examination of counsel. *See also State v. Alley*, 776 S.W.2d 506 (Tenn.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 775 (1990); *State v. Strouth*, 620 S.W.2d 467, 471 (Tenn.1981), *cert. denied*, 455 U.S. 983, 102 S.Ct. 1491, 71 L.Ed.2d 692 (1982). Under *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), a juror may be disqualified in a death penalty case only if his or her views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." This standard does not require that a juror's opposition to the death penalty be shown with "unmistakable clarity," but the trial judge must have the "definite impression" that a prospective juror could not follow the law. *Id.* at 425–426, 105 S.Ct. at 853.

■ In each instance in which the trial judge disqualified a juror on this basis, the juror had insisted that he or she was unable to impose the death penalty regardless of the law. When jurors were equivocal, the trial judge refused to excuse them without further questioning by counsel. We defer to the trial court's perception of the demeanor of various jurors' when responding to questions asked, and conclude that the jurors who denied that they could consider the death penalty were properly dismissed without rehabilitation.

## D. *Admission of Evidence*

■ In addition to these asserted errors on *voir dire*, Hutchison cites several evidentiary errors as grounds for reversal. He first argues that the letters that he wrote to co-conspirator Philip Varnadore were introduced against him in violation of Tenn.

**2.** *State v. Teague*, 680 S.W.2d 785, 790 (Tenn. 1984), *cert. denied*, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 662 (1985); *State v. Workman*, 667 S.W.2d 44, 49 (Tenn.1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984); *State v. Johnson*, 698 S.W.2d 631 (Tenn.1985), *cert. denied*, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 679 (1986).

**3.** *See Sommerville v. State*, 521 S.W.2d 792 (Tenn.1975) (jurors should be questioned individually whenever there is a "significant possibility" that a juror has been exposed to "potentially prejudicial material").

R.Crim.P. 16. Before trial and pursuant to Rule 16(a), defense counsel requested copies of any statements made by the defendant and any "books, papers, [or] documents ... within the possession, custody or control of the State, ... which are material to the preparation of [the] defense or are intended for use by the State as evidence in chief at the trial...." Without pretrial notice, the State nevertheless tried to introduce the Varnadore letters on the fourth day of trial. Defense counsel objected, claiming that Rule 16 had been violated and that the defendant would be unfairly prejudiced by the surprise admission of the letters because he could not change his trial strategy to accommodate them.

Rule 16, however, requires only that the State provide the defendant with copies of documents within the State's "possession, custody or control." The record shows that Varnadore's attorney did not give the State the letters until the middle of the trial because his client feared possible retaliation by the defendant. Because the State did not have the letters in its control, actually or constructively, until the middle of the trial, Rule 16 was not violated.[4] We find no prejudicial surprise, moreover, because defense counsel was given the weekend to review the letters and to prepare for cross-examination of Varnadore. Thus, the defendant's first basis for excluding the letters is meritless.

In addition to the Rule 16 violation, the defendant objects to the admission of the letters, claiming that only because of the court's prejudicial error was the State prepared to introduce them. Before a previous, aborted trial, the defendant sought reimbursement for a document examiner in an *ex parte* hearing pursuant to T.C.A. § 40–14–207(b). Hutchison alleges that the court inadvertently acknowledged this request at the end of the prior trial, thus putting the State on notice of the need for its own examiner. With no record of the previous trial, we cannot review the matter. We do, however, observe that the State originally called Dr. Larry Miller to identify the defendant's let-

ters to Ricky Miller. Because of Dr. Miller's availability when the Varnadore letters appeared, the defendant was not prejudiced by any earlier revelation by the court.

 Finally, the defendant argues that his letters to Varnadore and Varnadore's testimony were erroneously admitted because defense counsel was not allowed unrestricted cross-examination of Varnadore. Varnadore testified on direct examination about his receipt of the letters; he identified activities, claiming the Fifth Amendment privilege against self-incrimination. The defendant, nevertheless, sought to elicit answers about Varnadore's involvement with the other conspirators, insisting that the witness had waived his Fifth Amendment privilege and that the court would deny Hutchison his right to confront the witness if it refused to grant unlimited cross-examination.

 As to the scope of the privilege against self-incrimination, Tennessee law provides that:

> A witness cannot discontinue testimony as to transactions already disclosed by the witness. Once he discloses a fact, though incriminatory, he must testify with respect to the details of that fact.... A witness who testifies on direct examination is bound to answer questions on cross-examination with respect to the testimony that he gave on direct.

*State v. Stapleton,* 638 S.W.2d 850, 855 (Tenn.Cr.App.1982). Likewise, the United States Supreme Court has stated that:

> Since the privilege against self-incrimination presupposes a real danger of legal detriment arising from the disclosure, [a] petitioner cannot invoke the privilege where response to the specific question in issue here would not further incriminate her. Disclosure of a fact waives the privilege as to details.

*Rogers v. United States,* 340 U.S. 367, 372–3, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951); *reh'g denied,* 341 U.S. 912, 71 S.Ct. 619, 95 L.Ed. 1348 (1951). To determine the scope of cross-examination, many courts thus ask

---

4. *See also State v. Fears,* 659 S.W.2d 370, 378–9 (Tenn.Cr.App.1983) (psychiatric reports made at the request of the victim's mother and kept under

her control were not subject to Rule 16 discovery).

whether testimony would be "direct" or "collateral," with credibility issues often thought to be collateral matters. *See, e.g., United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); *United States v. Nunez,* 668 F.2d 1116, 1122 (10th Cir.1981). Where a question relates to the substance of direct testimony and only secondarily to the witness's credibility, however, the witness must answer. *Cardillo,* 316 F.2d at 611–3. In reviewing invocation of the privilege on cross-examination, our analysis should thus focus on "the purpose of the [cross-examiner's] inquiry and the role which the answer, if given, might have played in the defense." *Id.* at 612.

The trial court required Varnadore to answer questions about his illegal drug activity and about the defendant's letters, matters brought upon direct, but did not allow the introduction of testimony linking the witness to the murder. The trial court thus properly limited the scope of cross-examination. The additional questions asked by defense counsel sought to impeach Varnadore with collateral information about his role in the murder, and did not relate to his testimony on direct examination. Moreover, because Miller and Rollyson described Varnadore's participation in the murder, the jury was made aware of the evidence sought on cross-examination, and so the defendant was not prejudiced. We therefore conclude that the Varnadore letters and Varnadore's testimony were introduced without violating the defendant's right to confrontation.

■ As his next evidentiary complaint, the defendant alleges that the trial court erred by admitting co-conspirator hearsay without a prior determination that a conspiracy existed. Although the defendant moved the court to determine whether a conspiracy existed before allowing Ricky Miller to testify, the court admitted Miller's testimony subject to later evidence proving a *prima facie* case of conspiracy.[5] In *State v. Hodgkinson,* 778 S.W.2d 54, 61 (Tenn.Cr.App.1989), the Court of Criminal Appeals held that co-conspirator hearsay, admissible under Tenn. R.Evid. 803(1.2), may be admitted when "(1)

the declaration was made in furtherance of the conspiracy; (2) it was made during the pendency of the conspiracy; and (3) there is independent proof of the existence of the conspiracy and the connection of the declarant and the defendant to do it." The requirement of independent proof of a conspiracy, however, may be satisfied *after* the admission of the evidence. *Id.* (citing *Solomon v. State,* 168 Tenn. 180, 76 S.W.2d 331 (1934)). Thus, the trial court acted within its discretion by allowing Miller's testimony subject to later proof of a conspiracy.

■ The defendant complains, next, that the court did not follow the Sixth Circuit Court of Appeal's standard for admitting co-conspirator hearsay. *See United States v. Vinson,* 606 F.2d 149, 153 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756, *reh'g denied,* 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 251 (1980). In *Vinson,* the Sixth Circuit held that a defendant can make a "continuing" hearsay objection while the statements of conspirators are admitted pending a finding that a conspiracy exists. *Vinson,* however, emphasizes the importance of the court's eventual explicit finding of a conspiracy. We agree with the *Vinson* court that the trial court should make an explicit finding that a conspiracy was more likely than not to have existed, and we recognize that the trial court's conclusion in this case should have been clearly stated. Nevertheless, we find ample evidence to support the conclusion that a conspiracy existed to kill Huddleston, and we therefore find that the defendant was not prejudiced by the court's failure to enunciate its finding. Criminal investigator Bobby Joe Higgs searched defendant's home and found the insurance papers and promissory note signed by the other conspirators. Tim Huddleston testified of his uncle's intention to fish with Gaylor on the day of his death. Keith Wilson, the defendant's cell mate, testified that Hutchison stated that his co-conspirators knew better than to talk to police, and that "he could get something done from the jail" if they did talk. The medical examiner testified that a bruise behind the victim's ear was

---

**5.** *See State v. Wiseman,* 643 S.W.2d 354, 365 (Tenn.Cr.App.1982).

consistent with a blow to the head. Independent evidence thus supported the conclusion that a conspiracy more likely than not existed, and we find no error in the court's admission of Miller's testimony.

 The defendant also submits that the court erred in admitting two co-conspirator statements not made "during the course of and in furtherance of the conspiracy," as required by Tennessee Rules of Evidence 803(1.2). At trial, he moved to exclude Miller's testimony of Hatmaker describing himself committing the murder. He also sought to exclude Rollyson's testimony quoting Hatmaker as saying that "[o]ur man just got busted," and identifying "our man" as "Hutch." Alleging that the conspiracy ended immediately after the victim's death, the defendant argues that both of these statements made after the murder should have been excluded.

 In a case like this, however, a conspiracy continues until the conspirators' ultimate goal of collecting the proceeds of the crime has been achieved or abandoned. *See, e.g., State v. Coker,* 746 S.W.2d 167, 173 (Tenn.1987), *cert. denied,* 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); *United States v. Xheka,* 704 F.2d 974, 985–6 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Howard,* 770 F.2d 57, 59 (6th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). Federal case law holds, and we agree, that casual conversation between or among co-conspirators should not necessarily have been deemed to have occurred "in furtherance of" the conspiracy.[6] However, Hatmaker's conversation with Rollyson concerned their difficulty in collecting payment after Hutchison's arrest and clearly was a statement in furtherance of the conspiracy. Hatmaker's statement to Miller on the trip to Chicago, on the other hand, was not related to the collection of the insurance proceeds and was purposeless conversation. Therefore, his comments should

have been excluded as hearsay. Nevertheless, we conclude that the error was harmless because Hatmaker's statement identifying himself as the actual killer makes Hutchison no more likely to be guilty and, therefore, could not have affected the verdict. Moreover, Miller's previous testimony described the purpose of the conspiracy in detail, and other evidence confirmed the conspiracy's existence and purpose. Thus, the erroneous admission of this latter statement did not harm the defendant. *See* Tenn.R.App.P. 36(b).

### E. *Due Process*

 In addition to these evidentiary claims, the defendant argues that the trial court denied him due process at various points during the trial. His first claim is that the trial court erred in admitting Keith Wilson's testimony without the State having notified the defendant before trial. On the first day of the State's proof, the prosecutor notified the defendant for the first time that it would offer Wilson's testimony to establish a chain of custody for the defendant's jail letters and to describe the defendant's conversations about the conspiracy. Wilson had recently surrendered himself to police after having escaped from jail, and had therefore been previously unavailable. Before allowing his testimony, the court allowed defense counsel to interview Wilson and the State provided counsel with Wilson's criminal record. The defense thoroughly cross-examined Wilson.

 In reviewing the matter, we note that although T.C.A. § 40–17–106 requires that the names of prospective witnesses be listed on an indictment, "[t]he statute, directory in nature, does not necessarily disqualify a witness whose name does not appear on the indictment from testifying...." *See State v. Street,* 768 S.W.2d 703, 711 (Tenn.Cr.App. 1988); *State v. Morris,* 750 S.W.2d 746, 749 (Tenn.Cr.App.1987). Moreover, a defendant is not entitled to relief absent some preju-

---

**6.** *See e.g., United States v. Tarantino,* 846 F.2d 1384, 1411–3 (D.C.Cir.1988), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), *appeal from rem.,* 905 F.2d 458 (1990); *United States v. Snider,* 720 F.2d 985, 992 (8th Cir.

1983), *cert. denied,* 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984) ("To be admissible, the statements must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities.")

dice. *Id.*; *State v. Underwood,* 669 S.W.2d 700, 703 (Tenn.Cr.App.1984). Given defense counsel's thorough cross-examination of Wilson after having questioned him and reviewed his criminal record, and given no indication that Hutchison could have changed his defense strategy with earlier notice of Wilson's testimony, we hold that the admission of Wilson's testimony did not unfairly prejudice Hutchison.

 The defendant also seeks reversal on the basis of several repetitive questions asked during Wilson's testimony. The record, however, indicates that the prosecutor asked Wilson whom Hutchison would use to silence any conspirators who spoke to the police. In doing so, he reiterated part of Wilson's testimony about the defendant's threats from jail. This necessary repetition was not error.

 The defendant alleges that the court also denied him due process by allowing certain questions during the State's cross-examination of April Hutchison. After the defendant directly examined his wife, April, about the investigatory search of their home, about his cooperation during arrest, and, finally, about her own use of a stolen credit card fraud in order to impeach her. The defendant claims that the State violated Tenn. R.Evid. 608(b) by asking April about these specific "bad acts" for impeachment purposes, without first holding a jury-out hearing on the probative value of the evidence. However, after questioning a witness about prior bad acts, the defendant cannot prevent proper cross-examination. *State v. Johnson,* 670 S.W.2d 634, 636 (Tenn.Cr.App.1984). Also, although the defendant claims that the State exceeded the scope of direct examination, we note that the defendant failed to request a jury-out hearing on the probative value of this evidence. He therefore waived this objection.

 The defendant also argues that the court improperly refused to allow him to cross-examine co-defendant Chip Gaylor with leading questions after Gaylor testified in his own behalf. Hutchison relies on Tenn. R.Evid. 611(c), which permits leading questions on cross-examination. Gaylor, however, did not testify against Hutchison, but rather solely for himself. Therefore, Hutchison had no right to cross-examine him.[7]

 The defendant further contends that the admission of a boat dock receipt and a bond hearing order as rebuttal evidence was unfairly prejudicial. During Hutchison's testimony, he stated that he had seen Ricky Miller at a bond hearing, and thus knew where to send the letter that he wrote to Miller on April 10. The State introduced the bond hearing order as rebuttal evidence to show that the hearing occurred on April 24, thus impeaching Hutchison's testimony. Moreover, the boat dock receipt, showing that the victim rented a boat at 4:00 p.m. on the day of his death, was properly admitted to contradict Chip Gaylor's testimony that he could not have called Huddleston to go fishing. No error occurred in the admission of these pieces of rebuttal evidence.

 Hutchison alleges that hearsay evidence concerning the victim was improperly admitted as well. The court allowed Ricky Miller to state that on a previous fishing trip, the victim had commented that he thought Gaylor had pushed him in the water. The Advisory Commission's Comment to Tenn. R.Evid. 803(3) states that the hearsay exception for a declarant's existing state of mind "contemplates that only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." By this reasoning, Huddleston's statement would be inadmissible hearsay. However, given the overwhelming evidence of Hutchison's involvement in the conspiracy and the fact that this hearsay described only Gaylor's behavior, we find that the error was harmless beyond a reasonable doubt.

7. *See United States v. Andrews,* 765 F.2d 1491, 1500–1501 (11th Cir.1985), *reh'g den,* 772 F.2d 918, *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *Eder v. People,* 179 Colo. 122, 498 P.2d 945, 946 (1972); *State v. Nieves,* 13 Conn.App. 60, 534 A.2d 1231, 1232–1233 (1987), *cert. denied,* 207 Conn. 802, 540 A.2d 74 (1988); *United States v. Mercks,* 304 F.2d 771, 772 (4th Cir.1962); *People v. Braune,* 363 Ill. 551, 2 N.E.2d 839, 841 (1936); *State v. Mason,* 215 S.C. 457, 56 S.E.2d 90, 93 (1949).

The defendant cites a portion of Tim Huddleston's testimony as constituting yet another evidentiary error that denied him due process. Tim Huddleston, the victim's nephew, testified that his uncle received a phone call from Gaylor on the day of the murder and that immediately after the call the victim said that he was going fishing "with the boys." This evidence was properly admitted to show the victim's state of mind, his intention to fish.[8] Tim Huddleston's recognition of Gaylor's voice on the phone and the victim's subsequent comment tied Gaylor to the planned fishing trip and supported Ricky Miller's testimony.

The defendant finally objects to the exclusion of Ricky Miller's attorney, Mike Hatmaker, as a witness. For the first time on appeal, the defendant argues that Miller's attorney could have testified about any offer made by the State to Miller in exchange for his testimony. Hutchison claims that such testimony would have been a mitigating circumstance at the sentencing hearing. The defendant, however, failed to proffer this evidence at trial. Although he sought to call Hatmaker in his role as Varnadore's attorney, he did not proffer testimony regarding an agreement between the State and Ricky Miller. This issue is therefor not reviewable.

## F. *Jury Instructions*

In challenging the validity of his conviction, the defendant next disputes several instructions given at the guilt phase. He first argues that the court should have instructed the jury to receive accomplice testimony "with caution." This Court has previously held, however, that by requiring the jury to find some evidence corroborating an accomplice's testimony, the jury is sufficiently informed of the inherently suspect nature of accomplice testimony. Thus, an additional instruction is unnecessary. *Stanley v. State,* 189 Tenn. 110, 222 S.W.2d 384 (1949).

Secondly, the defendant argues that the court should not have instructed the jury that one is responsible for the consequences

of inflicting a dangerous wound. The evidence in the case, however, suggested the possibility of a blow to the victim's head behind his ear, making the "wound" instruction appropriate.

Finally, the defendant asked the court to charge the jury to consider the facts not as partisans, and to consider that the State wins whenever justice is done, regardless of the verdict. The court, however, explained the jury's duty to deliberate, to consider the evidence impartially, and to find the defendant not guilty unless the State proved its case beyond a reasonable doubt. We believe that these instructions adequately explained the jury's duty of impartiality. Thus, we find no error in the court's instructions.

## G. *Impartiality of Trial Judge*

Finally, the defendant urges that the trial judge injected his personal opinions and feelings into the trial to such an extent as to prejudice the defendant and thereby deny him due process. Canon 3(A)(3) of our Code of Judicial Conduct states that "[a] judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others...." Tenn.S.Ct.R. 10. He or she "must be extremely careful to avoid doing or saying anything that might prejudice the rights of the parties in the case." *Pique v. State,* 480 S.W.2d 546, 550 (Tenn.Cr.App.1971). In this case the trial judge sought to prevent defense counsel from arguing with a witness and tried to exclude irrelevant testimony. The court has wide discretion in controlling the form of questions[9] and the admission of evidence;[10] the trial judge did not abuse his discretion in these instances. The court also attempted to avoid repetitive testimony. We do not believe that he unfairly prejudiced the defendant in doing so.

## II. *Sentencing Phase of Trial*

At the sentencing hearing, the State presented no further evidence.

---

8. *See* Tennessee Rules of Evidence 803(3).

9. *See* Mothershed v. State, *578 S.W.2d 96, 99 (Tenn.Cr.App.1978).*

10. See *State v. Banks,* 564 S.W.2d 947, 949 (Tenn.1978).

The defendant presented the testimony of acquaintances to establish his good reputation in the community since childhood. His school records were introduced into evidence, along with proof of his success in the Future Farmers of America as a teenager. The defendant testified about his skills in repairing small machines and described how he could be useful while in prison. His ailing father and his wife also testified about his good qualities as a son and spouse and pleaded for mercy. The jailer testified that Hutchison had been a good prisoner. The jury also heard testimony that the defendant had no prior criminal record and had been gainfully employed since adulthood.

 The defendant's principal assignment of error with regard to the sentencing procedure concerns his request for jury instructions on several non-statutory mitigating circumstances. The trial judge rejected this motion, choosing instead to use the pattern instructions with which he was already familiar. He specifically told the jurors that they should consider "any other mitigating factor which is raised by either the prosecution or defense at either the guilt or sentencing hearing."

Prior to the overhaul of the penal code in 1989, this Court consistently held that a trial court did not have to instruct specific non-statutory mitigating circumstances, as long as the jury was told to consider any mitigating circumstance raised by the evidence.[11] In 1989, the statute on which the previous case law was based, T.C.A. § 39–2–203(e)(1982), was amended to state that:

> No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense ...

See T.C.A. § 39–13–203(e) (1989) (now codified at T.C.A. § 39–13–204(e)(1991)). Based on this modification, the defendant argues that the trial court committed constitutional error by failing to submit to the jury his requested non-statutory mitigating circumstances at his sentencing hearing in January, 1991, over a year after the effective date of the statute.

At least one state has found that the failure to charge non-statutory mitigating circumstances has constitutional implications. In *State v. Johnson*, 298 N.C. 47, 74, 257 S.E.2d 597, 616–7 (1979), the North Carolina Supreme Court opined that:

> A death penalty sentencing statute ... which by its terms or the manner in which it is applied, puts some mitigating circumstances in writing and leaves others to the jury's recollection might be constitutionally impermissible.

In *State v. Cummings*, 326 N.C. 298, 324, 389 S.E.2d 66, 80 (1990), the North Carolina Supreme Court held that:

> Where a defendant makes a timely written request for a listing in writing on the form of possible nonstatutory mitigating circumstances that are supported by the evidence and which the jury could reasonably deem to have mitigating value, the trial court must put such circumstances in writing on the form.

Although the North Carolina Supreme Court emphasized the importance of including non-statutory instructions in the jury's written instructions, the principle behind these cases is equal emphasis on both non-statutory and statutory instructions. These decisions base their constitutional interpretation on *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), which held that a court may not preclude the sentencing authority from considering any factor in mitigation of a crime.

In contrast to the North Carolina court's analysis, the Alabama Supreme Court has held that a trial court does not commit constitutional error by not instructing a sentencing jury on non-statutory mitigating circumstances requested by the defendant.[12] Simi-

---

**11.** *See State v. Hartman,* 703 S.W.2d 106, 118 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986); *see also State v. Wright,* 756 S.W.2d 669, 674 (Tenn.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 848, 102 L.Ed.2d 979 (1989); *State v. King,* 718 S.W.2d 241, 249 (Tenn.1986).

**12.** *See Cochran v. State,* 500 So.2d 1179, 1186 (Ala.1985), *on remand on other grounds,* 500 So.2d 1188 (1986), *aff'd* 500 So.2d 1064, *cert.*

larly, the Maryland Court of Appeals addressed a situation in which a capital defendant, relying on North Carolina precedent, had requested specific non-statutory factors to be instructed by stating:

> We do not believe that *Lockett v. Ohio,* 438 U.S. 586, [98 S.Ct. 2954, 57 L.Ed.2d 973] ... (1978), quoted by the North Carolina court, requires the decision sought by Bowers. * * * [I]n response to *Lockett,* provision has been made for the sentencing authority to list any other facts proven by a preponderance of the evidence which ... constitute a mitigating factor. To instruct the jury as Bowers requested would be a determination by the court that the facts listed by Bowers if found by the jury by a preponderance of the evidence were entitled to be considered mitigating circumstances. We do not believe that the statute, we do not believe that the statute, ... or *Lockett* contemplate such.[13]

The Maryland court recently reaffirmed its view that "there is no constitutional requirement that every potential mitigating circumstance be listed on the sentencing form." *Booth v. State,* 327 Md. 142, 162, 608 A.2d 162, 172 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992). Finally, the Illinois Supreme Court has also held that "a defendant's request for a jury instruction on nonstatutory mitigators may be refused by the trial court so long as the jury is informed that it should consider all potential mitigating circumstances."[14]

Thus, most courts have concluded that *Lockett's* insistence that the jury not be precluded from considering any mitigating factor does not constitutionally require a trial court to submit *every* requested instruction to a jury. We agree that neither the United States Constitution nor the Tennessee Constitution requires the trial judge to read or submit non-statutory mitigating circumstances to the jury.

Notwithstanding the foregoing, the trial judge properly instructed the jury in accordance with the statutory law in effect on the date of the commission of the offense in this case which was committed on 14 August 1988. T.C.A. § 40–35–117, enacted as Chapter 591, § 6, Public Acts 1989, (part of the Criminal Sentencing Reform Act of 1989), provides in subsection (b) for the sentencing of persons for offenses committed between 1 July 1982 and 1 November 1989. It excludes sentencing classification for first degree murder. T.C.A. § 39–11–112, enacted as Sec. I of Chapter 591 of the 1989 Acts, states specifically:

> **Repealed or amended laws—Application in Prosecution for Offense**—Whenever any penal statute is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute *in effect at the time of the commission of the offense.* Except as provided under the provisions of § 40–24–117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act. [Acts 1989, Ch. 591, § 1.] (Emphasis supplied).

It is apparent from the language in the statutes that first degree murder offenses are specifically excluded from the provisions of the Criminal Sentencing Reform Act and, in accordance with T.C.A. § 39–11–112 defendant's trial was properly to be conducted under the law in effect on the date of his offense.

 The defendant alleges that several other instructional errors occurred during the sentencing phase of his trial. For example, he requested and was denied an instruction defining "mitigating circumstances." We have previously held, however, that "mitigating" is a "word in common usage and

---

denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1986).

**13.** *Bowers v. State,* 306 Md. 120, 149–50, 507 A.2d 1072, 1086–7, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986).

**14.** *People v. Gosier,* 145 Ill.2d 127, 159, 163 Ill.Dec. 823, 582 N.E.2d 89 (1991), *cert. denied,* 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); *People v. Free,* 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218, *cert. denied,* 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).

certainly not a 'legalism' beyond the understanding of ordinary citizens composing a jury panel." *State v. Groseclose*, 615 S.W.2d 142, 147–148 (Tenn.1981), *cert. denied*, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981). The defendant further alleges that the court's instruction not to allow "sympathy" and "prejudice" to influence the verdict encouraged the jury to disregard mitigating evidence. Previously, we have held this assertion to be unfounded. *State v. Boyd*, 797 S.W.2d 589, 598 (Tenn.1990), *cert. denied*, 498 U.S. 1074, 112 L.Ed.2d 861 (1991). Finally, Hutchison insists that the instructions may have led the jury to believe that it would have to agree unanimously that a mitigating circumstance existed before considering it. We considered and rejected this argument in *State v. Bates*, 804 S.W.2d 868, 882–883 (Tenn.1991), *cert. denied*, 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991); *State v. Thompson*, 768 S.W.2d 239, 250–251 (Tenn. 1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990). Thus, we find the remainder of the defendant's challenges to the sentencing instructions to be without merit.

Defendant makes a broad based attack on the constitutionality of the Tennessee Death Penalty Statute. The principal arguments made on this issue are identical to or similar to issues previously addressed by the Court. The majority of these complaints are not personal to the defendant and have no affect on the outcome of this case. Therefore, we hold they are without merit.

■ T.C.A. § 39–13–206(c)(1)(D) requires this Court to review the sentence of death to make the determination that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. We have complied with the statute and find that the sentence of death was not imposed in an arbitrary fashion and that the evidence supports the jury's verdict. The record establishes that this was a deliberate, premeditated homicide, calculated by the defendant to have the victim killed by others in order to collect the proceeds of a large insurance policy which he had purchased on the victim's life. The evidence supports the the jury's finding of the absence of any mitigating circumstances found. We are satisfied that the sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. The sentence of death will be carried out as provided by law, on the ___ day of _____, 1994, unless otherwise ordered by this Court or other proper authority. Costs on this appeal are adjudged against the defendant.

DROWOTA and ANDERSON, JJ., concur.

REID, C.J., concurs and dissents with separate concurring and dissenting opinion.

DAUGHTREY, J., not participating.

REID, Chief Justice, concurring and dissenting

I concur with the majority's decision that the conviction of first degree murder be affirmed.

In dissent, I would hold that the defendant is not death-eligible because, in my view, the only aggravating circumstance found by the jury—the defendant "employed another to commit the murder for remuneration or the promise of remuneration," T.C.A. § 39–13–204(i)(4) (Supp.1993), is invalid in this case.

By statute,

No death penalty ... shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances....

T.C.A. § 39–13–204(i) (Supp.1993). Consequently, if the only aggravating circumstance found by the jury is invalid or inapplicable to this case, the defendant cannot be sentenced to death.

As set forth in my dissent in *State v. Stephenson*, 878 S.W.2d 530, 535 (Tenn.1994), use of this aggravator does not in fact narrow the class of death eligible defendants because "the same facts establish the crime and the aggravating circumstance; and, the aggravating circumstance adds no culpability beyond that necessary to establish first degree murder." Consequently, use of this aggravator violates Article 1, Section 16 of

the Tennessee Constitution and the Eighth Amendment to the United States Constitution. *State v. Middlebrooks,* 840 S.W.2d 317, 345–46 (Tenn.1992), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 48, 126 L.Ed.2d 19 (1993); *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) ("an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty").

For these reasons, I would find that the defendant is not death-eligible and impose a sentence of life imprisonment.

Discussion of the other issues raised by the defendant with regard to sentencing are pretermitted.

### ORDER ON PETITION TO REHEAR

CHARLES H. O'BRIEN, Special Justice.

Defendant has filed a Petition to Rehear in this case contending that the Court erred in its opinion by ruling he was not entitled to a jury instruction on nonstatutory mitigating circumstances in accordance with the provisions of T.C.A. § 39–13–204(e).

■■■■ The Court ruled that the trial judge properly instructed the jury in accordance with the statutory law in effect on the date of the offense which was committed on 14 August, 1988. We held that T.C.A. § 39–11–112, enacted as Sec. 1 of Chapter 591 of the 1989 Public Acts was applicable in this case. The statute provides in substance that when any penal statute is repealed or amended by a subsequent legislative act, any offense defined by the repealed statute committed while such statute or act was in effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense, unless the subsequent act provided for a lesser penalty, in which event any punishment imposed shall be in accordance with the subsequent act.

The defendant insists that the Court's reasoning is faulty due to the distinction between substantive and procedural law and that T.C.A. § 40–35–117(b), enacted as Sec. 6 of the Public Acts of 1989, Chapter 591, mandates that a defendant shall be sentenced under the statute. He overlooks the fact that T.C.A. § 39–11–112, cited by the Court in its opinion, was also enacted by Chapter 591 of the 1989 Acts as Sec. 1. The defendant contends that the definition of first degree murder and the punishment for first degree murder is substantive law entitling him to be tried under the definition of first degree murder at the time of the commission of the offense and to receive the punishment prescribed for first degree murder at the time of the commission offense. He says the manner of arriving at the punishment of first degree murder is procedural law and the new procedure applies regardless of the old law in effect at the time of the commission of the offense. He does not account for the fact that Chapter 11 of Title 39 and Chapter 35 of Title 40 were each enacted as part of Chapter 591 of the Public Acts of 1989.

We agree with the defendant that the distinction between substantive procedural law has long been recognized by the courts of this state. He has cited an early civil case to sustain his position.[1] However, we do not believe that rule applies in this case. T.C.A. § 40–35–101 confirms this conclusion. It provides that the Chapter shall be known and cited as "Tennessee Criminal Sentencing Reform Act of 1989." (Acts 1989, Ch. 591, Sec. 6). The first paragraph of the Sentencing Commission comments to this code section is as follows:

> This and the following sections are a part of the comprehensive penal and sentencing reform legislation enacted in 1989 as proposed by the Tennessee sentencing commission. Prior revisions either modified substantive criminal law or dealt exclusively with sentencing provisions. The commission believes that a unified approach is necessary so that there is a clear relationship between the definition of an offense and the sentence for that offense.

T.C.A. § 39–11–112 was enacted as Section 1 of Chapter 591 of the Acts of 1989 creating the Criminal Sentencing Reform Act. It appears to have been enacted to accomplish the purposes of the Act as stated by the Sentencing Commission in their comments. It is not a new law. As far as can be ascertained, it

1. *Spencer Kellogg & Sons, Inc. v. Lobban,* 204 Tenn. 79, 315 S.W.2d 514, 518 (1958).

was first noted in the Code of 1858 and has been part of our statutory law in one form or another since that time until its adoption by the 1989 legislature.[2] We are satisfied that the analysis and the conclusion reached by the Court in our original opinion is correct.

Defendant argues that T.C.A. § 40–35–117(b) is mandatory because it includes the directory word "shall", which is ordinarily construed as being mandatory and not discretionary. We observe that T.C.A. § 39–11–112 contains the same directory language. We have considered the matter at length and conclude the statutes are not incompatible.

In *State v. Brimmer*, 876 S.W.2d 75, 82 (Tenn.1994), this Court said:

T.C.A. § 40–35–117, enacted as Ch. 591, § 6, Pub. Acts 1989, and a part of the Criminal Sentencing Reform Act of 1989, provides in subsection (b) for the sentencing of persons for offenses committed between 1 July, 1982 and 1 November 1989 under the 1989 Act except where constitutionally prohibited. Sentencing Commission Comments to T.C.A. § 40–35–117 and 118, however, indicate that first degree murder is excluded from the provisions of these sections. We, therefore, find controlling the general provisions of § 39–11–112 and the principles against retroactive application of statutes. The trial court correctly instructed the sentencing law in effect at the time the murder was committed.

The Petition to Rehear is denied. The sentence of death will be carried out as provided by law on the 1st day of July, 1995, unless otherwise ordered by this Court or other proper authority.

ANDERSON, C.J., and DROWOTA, REID and BIRCH, JJ., concur.

**2.** Code 1858, Section 45; Shan.Sec. 59a3; Code 1932, Sec. 8; Modified; T.C.A. (orig. ed.) §§ 1–208: 1955; Public Acts 1968, Chapter 513. *See* *State v. Collins*, 528 S.W.2d 814, 815 (Tenn. 1975).