ADOLPHO A. BIRCH, JR., J.,
concurring in part and dissenting in part.
P concur in the conclusion of the majority that Rogers’ convictions should be affirmed. As to the sentence of death, however, I respectfully dissent. I continue to adhere to my view that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death penalty. See State v. Reid, 164 S.W.3d 286, 323-325 (Tenn.2005)(Birch, J., concur *621 ring and dissenting), and cases cited therein. Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the death penalty in this case.

APPENDIX

(Excerpts from the Court of Criminal Appeals’ Decision)
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2004 Session

STATE OF TENNESSEE v. WILLIAM GLENN ROGERS

Circuit Court for Montgomery County
No. 38939 Robert W. Wedemeyer, Judge
No. M2002-01798-CCA-R3-DD— Filed June 30, 2004
Joseph M. Tipton, J., delivered the opinion of the court, in which JAMES CuRWOOD Witt, Jr., and, John Everett Williams, JJ., joined.
OPINION
[Deleted: Factual Background]
I. SUFFICIENCY OF THE EVIDENCE
[Deleted]
II. CHANGE OF VENUE
The defendant contends that the trial court erred by refusing to change the venue of the trial because of adverse pretrial publicity. A change of venue may be granted if it appears that “due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.” Tenn. R.Crim. P. 21(a). A motion for change of venue is left to the sound discretion of the trial court and the court’s ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn.1993); State v. Hoover, 594 S.W.2d 743, 746 (Tenn.Crim.App.1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. State v. Mann, 959 S.W.2d 503, 531-32 (Tenn.1997). Similarly, prejudice will not be presumed on the mere showing of extensive pretrial publicity. State v. Stapleton, 638 S.W.2d 850, 856 (Tenn.Crim.App.1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. State v. Bates, 804 S.W.2d 868, 877 (Tenn.1991). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced by the pretrial publicity. State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn.Crim.App.2001); State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn.Crim.App.1989). Furthermore, the scope and extent of voir dire is also left to the sound discretion of the trial court. State v. Smith, 993 S.W.2d 6, 28 (Tenn.1999). Jurors who have been exposed to pretrial publicity may sit on the panel if they can demonstrate to the trial court that they can put aside what they have heard and decide the case on the evidence presented at trial. State v. Gray, 960 S.W.2d 598, 608 (Tenn.Crim.App.1997).
In State v. Hoover, 594 S.W.2d 743 (Tenn.Crim.App.1979), this court set forth the factors which should be considered to determine whether a change of venue is warranted. The Hoover court listed the following seventeen factors: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the de *622 gree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire person’s familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant’s utilization of his peremptory challenges; the defendant’s utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. Again, however, for there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the “defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him.” State v. Evans, 838 S.W.2d 185, 192 (Tenn.1992).
The defendant contends that pretrial publicity concerning his criminal history, including allegations of prior sexual abuse of children, was highly prejudicial and inadmissible. The defendant also asserts that the community from which the jury was drawn was a small community that had three cases of missing children, all young girls, at the time of the victim’s disappearance, which caused a climate of undue excitement. Most of the pretrial publicity concerning this case was published during the victim’s disappearance. The selection of the jury included questions to determine if any potential juror had been prejudiced by pretrial publicity. The defendant does not cite to any area of the record to support an allegation that the jury panel was prejudiced by pretrial publicity. In fact, he does not even allege that any of the jurors who sat on his case were prejudiced by the pretrial publicity cited. After our review of the record, we cannot find any proof that any of the jurors were prejudiced. Mere speculation that some of the jurors may have been exposed to pretrial publicity does not warrant a new trial. See Crenshaw, 64 S.W.3d at 386. The record fails to support the defendant’s allegation that the jury panel was prejudiced by pretrial publicity.
III. DEFENDANT’S STATEMENTS TO POLICE
[Deleted]
IV. DEFENDANT’S STATEMENTS TO THIRD PERSONS
The defendant contends that the trial court erred in refusing to suppress statements he made to his family, the victim’s family, and the press while he was in jail. He asserts that members of his family, the victim’s family, and the press acted as agents of the state in securing statements from him, and, accordingly, the statements should have been excluded from the trial.
The proof shows that after defendant’s arrest, he made collect telephone calls to the victim’s mother, Jeannie Meyer, and Ms. Meyer’s husband, Wilbur Meyer, from jail. After the telephone calls began, the Meyers contacted the authorities to determine if they could record the calls. There is no proof that the law enforcement officials suggested that the Meyers record the conversations or even continue to accept the collect calls. In fact, Ms. Meyer testified that two officers advised that she did not have to talk with the defendant, and one of those officers even urged her not to speak with the defendant. Ms. Meyer said she continued to accept the calls because she wanted to locate her daughter’s body. *623 The Meyers testified that they gave the tapes to the authorities to help with the investigation. The state did not introduce the tape recordings at trial. Additionally, the defendant sent a letter to Wilbur Meyer in which he denied killing the victim.
The defendant also contacted reporter David Ross, who worked with the Clarks-ville Leaf Chronicle. Mr. Ross interviewed the defendant and tape recorded the interview. Mr. Ross testified that no one encouraged or requested him to speak with the defendant. He did not contact any law enforcement authorities about his interview until it was completed. He testified that he only turned over a transcript of his interview to authorities for the purpose of helping to locate the victim’s body. Mr. Ross admitted that he spoke with the Meyers and shared information with them. The defendant asserts that Mr. Ross “through the Meyers, also became a state agent.”
Finally, the defendant contends that his own mother and step-brother became state agents when they drove to Tennessee from Louisiana to speak -with him following his arrest. The defendant’s step-brother testified that he met with the defendant in an attempt to find out what had happened and to determine if he could help find the victim. Cynthia and David Schexnayder did not contact the authorities until after they had met with the defendant. After their meeting with the defendant, the Schexnayders agreed to give authorities a statement about their conversations.
The Sixth Amendment guarantees the accused the right to rely on counsel as a “medium” between the accused and the state following the initiation of formal charges. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The United States Supreme Court and this court have held that incriminating statements may not be deliberately elicited from an accused by action of the state, as such action amounts to an interrogation. Id.; State v. Webb, 625 S.W.2d 281, 284 (Tenn.Crim.App.1980). This court determined in Webb that the authorities had subverted the accused’s right to counsel when they placed an undercover agent in a jail cell with the accused who elicited statements from the accused. Webb, 625 S.W.2d at 284. However, the facts of this case are far different from the facts in Massiah and Webb.
The state did not direct, elicit, or otherwise attempt to procure statements from the defendant through any of the subject persons. The defendant contacted the Meyers and David Ross. Neither the Meyers nor David Ross were asked by the state to elicit information from the defendant. Instead, the authorities discouraged Jeannie Meyer from communicating with the defendant. The defendant’s family members, Cynthia and David Schexnay-der, visited the defendant in jail on their own in an attempt to get information about the location of the victim’s body. The Schexnayders did not go to the authorities with their information until following their meeting. There is no proof in the record to substantiate the defendant’s arguments that the Meyers, David Ross, or the Schex-nayders acted as state agents. Accordingly, the trial court was correct in concluding that the defendant’s constitutional rights were not violated by the admission of statements the defendant voluntarily made to the subject parties. This issue is without merit.
V. EXCLUSION OF PROSPECTIVE JURORS FOR CAUSE
Prospective jurors Marita Washington and Jeannie Green were excused for cause by the trial court based on their opposition to the imposition of the death penalty. *624 The defendant argues that the exclusion of these jurors violated his constitutional rights. Specifically, the defendant contends that the state failed to meet its burden of proving that these two jurors’ views would substantially impair their ability to carry out the law as required by Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is “whether the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” State v. Austin, 87 S.W.3d 447, 472-473 (Tenn.2002) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). “[T]his standard likewise does not require that a juror’s biases be proved with ‘unmistakable clarity.’ ” Id. at 473, 87 S.W.3d 447. However, the trial judge must have the “definite impression” that a prospective juror could not follow the law. State v. Hutchison, 898 S.W.2d 161, 167 (Tenn.1994) (citing Wainwright, 469 U.S. at 425-26, 105 S.Ct. at 853). Finally, the trial court’s finding of bias of a juror because of his or her views concerning the death penalty are accorded a presumption of correctness, and the defendant must establish by convincing evidence that the trial court’s determination was erroneous before an appellate court will overturn that decision. State v. Alley, 776 S.W.2d 506, 518 (Tenn.1989), cert. denied, 493 U.S. 1036, 110 S.Ct. 758 (1990).

A. Prospective Juror Washington

Prospective juror Marita Washington expressed her views on the imposition of the death penalty in responses to a juror questionnaire and during individual voir dire. Ms. Washington stated on the juror questionnaire that she was opposed to the death penalty but willing to consider its imposition under appropriate circumstances. Ms. Washington also stated on the questionnaire that she was strongly opposed to the death penalty and believed it should not be imposed, but she asserted that she could set aside her personal feelings and follow the law as instructed by the court. Ms. Washington further stated on the questionnaire that she thought the death penalty should never be imposed, but as long as the law provided that punishment, she could vote to impose the death penalty if she believed “it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant.” Her questionnaire reflected that she did not believe that death was too severe a punishment for any defendant convicted of first degree murder.
The following exchange took place between the court and Ms. Washington during voir dire:
The Court: Okay. And you have already said now — the General asked you to give an example of a kind of case where you think you could vote for the death penalty and you couldn’t think of one, but if the evidence in this case was such that you felt like yes, in this case the State has proven beyond a reasonable doubt that there is one or more aggravating circumstances and they have also convinced you beyond a reasonable doubt that those — the aggravating circumstance outweighs the mitigating circumstance, okay? And you are saying to yourself, based on that, what this instruction says is that the verdict of the jury shall be death? At that point in time, if that’s how you see the case, are you going to then be saying well, I know that’s what the law says and I know that’s what the *625 Judge says and we went through all these questions but I just feel so strongly against the death penalty that I just couldn’t — I could not sign off on a form and sentence somebody to death? Think you could sign the form if you thought the proof was there?
Prospective Juror: No.
[[Image here]]
The Court: So in all honesty then, this is the last thing that I am going to ask you, I promise you. Do you feel like your personal view on capital punishment would either prevent or substantially impair the performance of your duties as a juror in this case?
Prospective Juror: Substantially impair.
The Court: Substantially impair. Okay.
The defendant contends that Ms. Washington must have misunderstood[1] the last question asked by the court, but there is no proof in the record to substantiate this allegation. Ms. Washington admitted that her personal views on the death penalty would substantially impair the performance of her duties as a juror. Thus, Ms. Washington’s responses to the voir dire questioning support her dismissal under Wainwright. After reviewing the record, we conclude that prospective juror Washington met the standard for dismissal. See Hutchison, 898 S.W.2d at 167.

B. Prospective Juror Green

Prospective juror Jeannie Green responded on the juror questionnaire that she was strongly opposed to the death penalty, but she also responded that she could set aside her personal feelings and follow the law as instructed by the court. Like prospective juror Washington, Ms. Green responded that she could vote to impose the death penalty if she believed “it was warranted in a particular case, depending on the evidence, the law, and what I learned about the defendant.” During voir dire, Ms. Green responded to questions regarding the imposition of the death penalty as follows:
THE COURT: All right. So, if you’re a juror on this case, now, Ms. Green, and the State convinces you beyond a reasonable doubt, first of all, that the Defendant is guilty of first degree murder and that there is one or more statutory aggravating circumstances — now, that’s legal language, but that’s what I’m required to explain to you at this time. And further that they convince you in your mind that the statutory aggravating circumstance or circumstances outweigh any mitigating evidence beyond a reasonable doubt, what the instructions would say to you as a juror is your verdict shall be death. You understand that’s what you’d be looking at on the jury instructions?
MS. GREEN: Uh-huh. Yes.
THE COURT: Now, you’ve already told me that you have a personal belief that I would say is against the death penalty.
MS. GREEN: Right.
THE COURT: Would your personal belief be so strong that it would interfere with your ability to vote for a death sentence even if the evidence and the law pointed in that direction?
MS. GREEN: I have to vote against it, sir.
*626 THE COURT: All right.
MS. GREEN: I’m sorry.
THE COURT: All right. Can you think — you don’t have to apologize at all. Like I said, it’s just—
MS. GREEN: Well, I will.
THE COURT: We just want to know what your view is. Would — can you think of any circumstances where you’d be able to vote for a death sentence?
MS. GREEN: If he actually come out and said he did it himself. Nobody else. No newspaper; no nothing; just him then I’d go for the death penalty.
THE COURT: Okay. So, in your mind what you’re — what you’re basically saying is if the defendant himself said—
MS. GREEN: Uh-huh.
THE COURT: — I killed somebody,—
MS. GREEN: Uh-huh.
THE COURT: — then you could consider for the—
MS. GREEN: Right.
THE COURT: All right.
MS. GREEN: Uh-huh
THE COURT: And, of course, now, the law doesn’t say that a defendant has to admit to it.
MS. GREEN: Right. Right. I realize this.
THE COURT: But you’re — I guess, we’ve got another little conflict here between the law and what you — what your personal beliefs might be?
MS. GREEN: Uh-huh.
THE COURT: That doesn’t mean that your personal belief is wrong, but I just need to know if your personal belief would interfere with your ability to follow the law. Do you think it would?
MS. GREEN: I think so, because I am not — I’m not for the death penalty.
THE COURT: Okay.
MS. GREEN: I really am not.
[[Image here]]
THE COURT: We’ve got two more to go. I’ll tell you what we’re going to do, Ms. Green, I’m going to let the lawyers ask you a few questions.
MS. GREEN: Okay.
THE COURT: And you just keep answering them as honestly as you have to me.
MS. GREEN: Okay.
THE COURT: And then I’ll figure out what to do in a few minutes; okay?
MS. GREEN: All right. Fine.
THE COURT: General Brollier?
STATE: Ms. Green?
MS. GREEN: Yes.
STATE: You’ve said that you’re strongly opposed to the death penalty, and you’re not for the death penalty. Is that based on a matter of religious faith?
MS. GREEN: Yes, I’m Catholic
STATE: Okay. And would you say that it would be difficult for you, then, to— as the Court has told you the law in • the—
MS. GREEN: Uh-huh.
STATE: — State of Tennessee does impose the death penalty in some situations.
MS. GREEN: Uh-huh.
STATE: And as a Catholic you do not believe the death penalty should be imposed, I assume?
MS. GREEN: Right.
STATE: Now, so, there’s a conflict between the law of Tennessee and your faith.
*627 MS. GREEN: Right.
STATE: And you may be asked if you’re a juror in this case to make a decision that would bring that conflict right, just right up to you,—
MS. GREEN: Uh-huh.
STATE: — and you’d have to decide whether you’re going to follow the law or are you going to follow your faith?
MS. GREEN: Uh-huh.
STATE: Do you see it in those terms?
MS. GREEN: Yeah, I’m still against the death penalty. If it’s—
STATE: Okay. That’s what I’m asking.
MS. GREEN: — against the State of Tennessee I’m sorry.
STATE: So, what you’re saying is you would follow the faith — your faith, your Catholic faith—
MS. GREEN: Right.
STATE: — above the law of Tennessee?
MS. GREEN: Right.
STATE: Okay.
MS. GREEN: Sure would.
STATE: Ms. Green, as I understand it then, you said — okay. I’m going to leave it at that, Your Honor. Thank you.
THE COURT: All right.
After reviewing the record, we conclude that Ms. Green met the standard for dismissal. See Hutchison, 898 S.W.2d at 167.
VI. CROSS-EXAMINATION OF THE VICTIM’S BROTHER, JEREMY BEARD
[Deleted]
VII. PHOTOGRAPHS OF VICTIM

A. Photographs of victim’s skull

The defendant contends that the trial court erroneously admitted eight photographs of the victim’s skull in the wooded area where it was found. The state argues that it introduced the photographs of the skull, which was intact and not fractured, to rebut the defendant’s claim that he had accidentally run over the victim and thrown her body in the river, to support the testimony of Dr. Marks and his identification of the victim, and to depict the location of the area where the skull was found. The trial court ruled that the photographs were not particularly gruesome and that any prejudicial effect was minimal. The trial court stated on the record: “We do have a dead child and a decomposed body and a skeleton and so all things considered, I am going to let [the photographs] in.”
The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-57 (Tenn.2000), cert. denied, 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994); State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978). As the Supreme Court stated in Carruth-ers, the modern trend is to vest more discretion in the trial judge’s rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949); State v. Michael Carlton Bailey, No. 01C01-9403-CC-00105, Dickson County, 1995 WL 424996 (Tenn.Crim.App. July 20, 1995), app. denied (Tenn. Jan. 8, 1996).
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Tenn. R. Evid. 401. However, relevant evidence “may be excluded if its probative *628 value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn.Crim.App.1993)). The court must still determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. Id. The term “undue prejudice” has been defined as “[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.” Banks, 564 S.W.2d at 950-51.
In Banks, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence. A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant’s contentions. Banks, 564 S.W.2d at 951. In this case, all of the photographs at issue are accurate and clear, and they have substantial evidentiary value. The photographs depict the area in which the skull was found. They support the testimony of Dr. Marks’ testimony as to the identity of the victim as well as that of Jerry Lee Brown who found the remains. We believe that the photographs are not particularly gruesome and that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice, misleading of the jury, or confusion of the issues. The trial court did not abuse its discretion in admitting the photographs.

B. Life photograph

The defendant also challenges the introduction of a photograph of the victim taken during her lifetime. The defendant claims that the photograph served only to inflame the jurors and appeal to their emotions. The state responds that the photograph was probative of the impact the victim’s death had on family members and to show those unique characteristics which provide a brief glimpse into the life of the victim. The Tennessee Supreme Court has held:
[generally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual’s death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim’s immediate family.
Nesbit, 978 S.W.2d at 887. In this case, the photograph was introduced to provide a brief glimpse into the life of the victim, as allowed by Nesbit. Moreover, the photograph admitted in this case was the same photograph the defendant signed to acknowledge that the picture depicted the girl he had claimed he ran over and threw into the river. The court did not err in allowing the introduction of this photograph.
VIII. “INTENTIONAL” ELEMENT OF FIRST DEGREE PREMEDITATED MURDER
[Deleted]
IX. FAILURE TO INSTRUCT VEHICULAR HOMICIDE AS A LESSER INCLUDED OFFENSE OF FIRST DEGREE MURDER
The right to jury instructions on lesser included offenses is based, in large measure, upon the constitutional right to trial by jury. See Tenn. Const. art. I, § 6; State v. Bowles, 52 S.W.3d 69, 77 (Tenn.2001). The question of whether a given *629 offense should be submitted to the jury as a lesser included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn.2001) (citing State v. Smiley, 38 S.W.3d 521 (Tenn.2001)). The standard of review for mixed questions of law and fact is de novo with no presumption of correctness. Id.; see also State v. Burns, 6 S.W.3d 453, 461 (Tenn.1999). The trial court has a duty “to give a complete charge of the law applicable to the facts of a case.” State v. Harbison, 704 S.W.2d 314, 319 (Tenn.1986); see also Tenn. R.Crim. P. 30. In addition, the trial court has a statutory duty to instruct the jury on all applicable lesser included offenses. See T.C.A. § 40-18-110.
At the close of proof, the defendant asked that the court charge the jury on the elements of vehicular homicide. The defendant asserted that vehicular homicide was a lesser included offense of first degree murder. The trial court denied the defendant’s request for instruction of vehicular homicide as a lesser included offense of first degree murder. In denying the request, the trial court found that vehicular homicide was not a lesser included offense of first degree premeditated murder under the test set forth by the Supreme Court in Bums, 6 S.W.3d at 466-67. The trial court specifically determined that vehicular homicide contained the statutory element of operation of an automobile, which was in addition to the statutory elements of first degree murder.
In Bums, our supreme court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser included offense:
An offense is a lesser-included offense if:
(a)all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property or public interest, or
(c) it consists of
(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).
Burns, 6 S.W.3d at 466-67.
After the trial in this case, this court held that vehicular homicide is not a lesser included offense of first degree murder. State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144, Hamilton County, 2000 WL 294964 (Tenn.Crim.App. Mar. 22, 2000). The court analyzed the statutory elements of vehicular homicide and first degree murder, as required by Bums and explained as follows:
Under our statutory scheme, the term “criminal homicide” means “the unlawful killing of another person which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide, or vehicular homicide.” Tenn.Code Ann. § 39-13-201. First degree murder is defined as follows:
(a) (1) a premeditated and intentional killing of another;
*630 (2) a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy; or
(3) a killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.
(b) No culpable mental state is required for a conviction under subdivision (a)(2) or (a)(3) except the intent to commit the enumerated offenses or acts in such subdivisions.
By comparison, the statute prohibiting vehicular homicide provides, in pertinent part, as follows:
(a) Vehicular homicide is the reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle:
(1) As the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or
(2) As the proximate result of the driver’s intoxication as set forth in § 55-10-401. For the purposes of this section, “intoxication” includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.
TenmCode Ann. § 39-13-213. Vehicular homicide, of course, requires the “operation of an automobile, airplane, motorboat, or other motor vehicle.... ” That element is not necessary for the conviction of either first degree murder or second degree murder. In Dominy, our supreme court placed emphasis upon the defendant’s constitutional right to be given notice of the offense or offenses charged. 6 S.W.3d at 476; see also State v. Hill, 954 S.W.2d 725, 727 (Tenn.1997). It observed that TenmCode Ann. § 40-30-202 required indictments to “state the facts constituting the offense in ordinary and concise language ... in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment_” Dominy, 6 S.W.3d at 476, n. 6; see also Tenn. R.Crim. P. 31(c) (“The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.”). Our supreme court cited with approval Howard v. State, 578 S.W.2d 83, 85 (Tenn.1979), and its holding that “an offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but not are not congruent with, all the elements of the lesser.” Dominy, 6 S.W.3d at 476. In other words, the offense is lesser included if “all its elements are contained within the elements of the offense charged in the indictment.” Id.
Because vehicular homicide contains a statutory element not contained in first degree murder, that is, “the operation of an automobile, airplane, motorboat or other motor vehicle,” vehicular homicide is not a lesser included offense. That additional element has nothing to do, of course, with the mental state of the defendant or the harm or risks to the victim. An indictment charging first degree murder would not be sufficient to support a conviction of vehicular homicide. Thus, the trial court here was not in error by refusing to charge to the jury the offense of vehicular homicide.
Harvey Phillip Hester, slip op. at 13-15. The defendant acknowledges this court’s *631 holding in Hester, but asks this court to reverse that decision. The defendant also seeks an exception to Bums, maintaining that the application of Bums to his case deprived him of the right to present a defense. We conclude, however, that Harvey Phillip Hester reflects the correct law and that no basis exists to provide an exception to Bums for vehicular homicide.
X.CONSTITUTIONALITY OF T.C.A. § 39-13-204
The defendant contends that T.C.A. § 39-13-204(f), providing that the jury must unanimously agree that the aggravating circumstances do not outweigh the mitigating circumstances in order to impose a life sentence, and T.C.A. § 39-13-204(h), prohibiting the trial court from informing the jury as to the effect of a nonunanimous verdict in the sentencing phase, violate his state and federal constitutional rights to a fair trial. Further, the defendant argues that Tennessee’s death penalty statutes violate the holdings of McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 1233 (1990), and Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in that they require the jury to agree unanimously that the aggravating circumstances do not outweigh the mitigating circumstances before providing for a sentence less than death. See T.C.A. § 39-13-204(f)(l)-(2). These arguments have been rejected by the Tennessee Supreme Court. State v. Keen, 31 S.W.3d 196, 233 (Tenn.2000); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.1994); State v. Hall, 958 S.W.2d 679, 718 (Tenn.1997); State v. Cazes, 875 S.W.2d 253, 269 (Tenn.1994); State v. Smith, 857 S.W.2d 1, 22-23 (Tenn.1993); State v. Harris, 839 S.W.2d 54, 76-77 (Tenn.1992); State v. Thompson, 768 S.W.2d 239, 250 (Tenn.1989).
XI.IMPOSITION OF DEATH PENALTY
Finally, the defendant contends that the death penalty is unconstitutional because it is imposed in a discriminatory manner. The Supreme Court has rejected this argument and held that the death penalty is not imposed in a discriminatory manner as to economics, race, geography or gender. State v. Hines, 919 S.W.2d 573 (Tenn. 1995); Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 22-23.
XII.CONSTITUTIONALITY OF PROPORTIONALITY
REVIEW
The defendant contends that the proportionality review mandated by T.C.A. § 39-13-206 is inadequate because it fails to apply meaningful standards for assessing whether a death sentence is disproportional. The supreme court set forth the criteria for determining whether a sentence is proportional in State v. Bland, 958 S.W.2d 651, 667-68 (Tenn.1997). The defendant challenges the adequacy of Tennessee’s proportionality review and the criteria set forth in Bland, but the supreme court has rejected this challenge on numerous occasions. See Brimmer, 876 S.W.2d at 87; Cazes, 875 S.W.2d at 270-71; Harris, 839 S.W.2d at 77.
XIII.REVIEW PURSUANT TO T.C.A. § 39-13-206(c)
[Deleted]
CONCLUSION
[Deleted]

. The defendant contends that because Ms. Washington was bom in Germany, and English is her second language, she misinterpreted the question as being required to choose between the possibilities that her views would either prevent or substantially impair her performance as a juror.