# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 27, 2010

## STATE OF TENNESSEE v. RICHARD TREHERN

**Appeal from the Criminal Court for Hawkins County**
**No. 07CR0303     John F. Dugger, Jr., Judge**

_____

**No. E2009-00066-CCA-R3-CD - Filed July 7, 2010**

_____

The Defendant, Richard Trehern, was convicted by a jury in the Hawkins County Criminal Court of two counts of aggravated child abuse, a Class A felony. The trial court sentenced him as a Range I, violent offender to concurrent twenty-year sentences. On appeal, the Defendant contends that the evidence is insufficient to support his convictions, that the trial court erred by denying his motion to compel the State to produce the victim's and the victim's brother's medical records, and that his sentences are excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Greg W. Eichelman, District Public Defender, and R. Russell Mattocks, Assistant Public Defender, for the appellant, Richard Trehern.

Robert E. Cooper, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; C. Berkeley Bell, Jr., District Attorney General; and J. Douglas Godbee, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was indicted on three charges of aggravated child abuse of his infant daughter. The Defendant married Michelle Trehern in Alabama. The couple divorced in November 2006, and Trehern moved back to Tennessee. She gave birth to the victim on December 20, 2006. The couple attempted to reconcile. The Defendant moved to Tennessee and began living with Trehern on March 5, 2007.

Dr. Stanley Giles testified that he was the victim's pediatrician. He first saw the victim when she was six days old. He saw the victim again on April 2, 2007, and she had a fever of 101 degrees, a runny nose, a cough, diarrhea, and she was spitting up. The victim weighed fifteen pounds and four ounces. No injury or trauma was reported. He next saw the victim on April 11, 2007, for a fever of 103 degrees. The victim was sleeping a lot, was difficult to wake, did not want to eat, and seemed exhausted and inactive. The victim's mother reported that when she changed the victim's diaper, the victim shook her arms. The victim's mother had called a nurse at Wellmont Health Systems, and the nurse thought the victim might have experienced a seizure. There was no history of injury or trauma, and because the victim was losing weight, Dr. Giles made the diagnosis of "failure to thrive." He ordered a complete blood count, a basic metabolic panel, and thyroid testing, but other than a minimally elevated white blood cell count, the test results were normal. There was no evidence of a bleeding disorder, blood disorders, kidney disorder, or diabetes.

On cross-examination, Dr. Giles testified that the victim had weighed five pounds and fourteen ounces at her six-day visit. The victim's birth weight had been six pounds and five ounces, but Dr. Giles said that it was normal for a newborn infant to lose ten to twelve ounces after birth. Dr. Giles's partner, Dr. Fuller, examined the victim at seven weeks of age for a possible umbilical hernia, and the victim weighed eleven pounds and six and one-half ounces. Dr. Giles examined the victim at two months of age and detected a heart murmur, the umbilical hernia, and a bad diaper rash. He referred the victim to a cardiologist. He also referred her to physical therapy for congenital torticollis, which involved the victim's neck muscles being pulled from the left or right. He said the condition could occur from positioning in the crib or from stretching the muscles during birth. Otherwise, the victim appeared to be active, responsive, and developing normally. He did not detect any bruising or evidence of trauma.

Dr. Christopher Arnold Landis testified that he was the emergency room physician at Wellmont in Hawkins County. He was not working on April 7, 2007, when the victim was seen in the emergency room, but he reviewed the records from that visit. The victim's mother had reported that the victim would not eat or sleep and had a runny nose and diarrhea. He said that no history of injury or trauma was noted. Dr. Landis saw the victim in the emergency room on April 18, 2007, and admitted her for possible seizure activity. The victim remained overnight for observation, but no seizure activity was recorded. There was no indication of trauma or injury. Dr. Landis also ordered a complete blood count and a chemistry panel, which were normal except for a slightly elevated white blood cell count. He also referred the victim to Dr. Christopher Calendine, a pediatrician, for observation. He said Dr. Calendine or Dr. Calendine's nurse practitioner had noted the victim had an ear infection. He said Dr. Calendine had conducted a urinalysis which indicated a possible urinary tract infection. He found no source for any seizures.

On cross-examination, Dr. Landis testified that he did not review the victim's emergency room records from April 7 at the time of the victim's April 18 visit. He was unaware until later that the victim had been seen in the emergency room on April 7. Dr. Landis explained that there was no predictor for when a seizure would occur. The victim's mother had described the victim's seizure as a generalized jerking and holding of the breath or not breathing. He did not observe any bruising or signs of abuse, and he said there was no recorded abuse. He said the victim looked like a baby who did not feel well, "just kind of sleepy, lying there in no apparent distress." The victim's pupils were normal.

Dr. Donald Sleeter testified that he was an emergency medicine physician at the Hawkins County Emergency Department. He saw the victim in the emergency room on April 21, 2007. He said the victim was reported to have experienced another seizure episode which lasted five to ten seconds. He believed the seizure was tonic, meaning that the victim's muscles flexed and then relaxed. He reviewed the victim's previous admission records and ordered a CT scan of the victim's head. He did not observe any physical signs of trauma or injury. The victim appeared to be awake and relatively healthy. He said the victim had already been scheduled for a follow-up appointment with a neurologist. He said that Dr. Gash, a radiologist with NightHawk Services in Knoxville conducted the "wet read," or initial review of the victim's CT scan. The scan showed large collections of blood on both sides of the brain, one being 1.5 centimeters and the other was 5 millimeters. The scans showed areas of decreased density, meaning that the blood there was older, or chronic. Upon Dr. Calendine's recommendation, Dr. Sleeter transferred the victim to the pediatric intensive care unit at Johnson City Medical Center.

On cross-examination, Dr. Sleeter testified that the victim appeared active and alert. He said her pupils were equally reactive and normal. However, he did not perform a funduscopic examination of the victim's eyes. He said the CT scan did not show evidence of blunt trauma, but only the large subdural fluid collections. The victim's fontanels appeared normal.

Dr. Judson Gash testified that he was a radiologist with the Association of University Radiologists and the University of Tennessee. He said he read a chest x-ray of the victim conducted on April 18 and a head CT scan of the victim conducted on April 21. He said that the areas of linear hyperdensity, or brightness, on the CT scans represented blood. He said that the brighter the density, the more recent the bleeding. He said that an acute hemorrhage was one that had occurred within a few hours to a few days before the scan. Dr. Gash described three areas of abnormality. The first was an interspheric hemorrhage, which meant that it was between the hemispheres of the brain, and it was acute. The second area of abnormality was a low density or chronic subdural hematoma over the victim's right cerebral hemisphere. This area of old hemorrhage had pushed the brain away from the skull. The

third area of abnormality was an intermediate collection of blood over the left frontal lobe. This area of hemorrhage could have been subacute, or several weeks old, or it could have been an old hemorrhage with a new hemorrhage in it. He said that the hematomas had different ages and that the most likely cause was non-accidental head injury, or shaken baby syndrome. He said that based upon his findings, the victim had suffered more than one injury.

On cross-examination, Dr. Gash testified that non-accidental trauma was a synonym for child abuse, battered child syndrome, and shaken baby syndrome. The same type of injury would not be unusual as a result of a motor vehicle accident. However, the pattern of acute and older hemorrhage and the interhemispheric hemorrhage in this case were highly specific and highly suggestive indicators for non-accidental head injury, particularly when there was no evidence of external trauma. He agreed that "suggestive" did not mean "conclusive." He acknowledged that cerebral hemorrhage could occur as a result of birth and that a child's minor cerebral hemorrhage at birth could be exacerbated by a later trauma such as being dropped. However, placing a child in a "bouncy" seat or swing would be extraordinarily unlikely to create the acceleration and deceleration necessary to cause the type of injuries in this case. He said a fall would be very unlikely to create the pattern of injuries similar to the victim's.

Michelle Trehern testified that she had married the Defendant when she lived in Alabama and that they had two children. She was awarded full custody of the children upon the couple's divorce in November 2006. She moved back to Tennessee in October 2006, and the Defendant came to live with her on March 5, 2007. At first, her mother and her mother's neighbor babysat the victim while she worked. After the Defendant moved to Tennessee, he and some neighbors babysat the victim, although she could not remember the neighbors' names.

Ms. Trehern testified that the victim regressed in development. The victim had problems holding up her head, when she had been able to before, and the victim also stopped rolling over. It was difficult to keep the victim awake. She denied seeing the Defendant shake the victim, but when asked if the victim had been crying before she caught the Defendant shaking the victim, she responded that the victim had been crying for a few minutes. She said the Defendant had a bad temper and had to attend anger management classes for about a month. The Defendant called the victim a "b----" once or twice when he was very frustrated. She said the Defendant did not understand why the victim kept crying.

Ms. Trehern testified that she made a statement to Investigator Teddy Collingsworth and signed it. However, she denied making any corrections to the statement. She said that she initialed the corrections that Collingsworth made. She did not agree that she told

Collingsworth that the Defendant was the only person who cared for the victim while she worked. She said she told Collingsworth and the Department of Children's Services (DCS) that neighbors also babysat the victim. She claimed that Collingsworth would not let her read the statement after he wrote it but that he read it aloud to her. She said that Collingsworth never read anything to her about the Defendant shaking the victim. She agreed that she told Collingsworth that she might know what caused the injuries, but she denied that she meant that the cause was the Defendant's shaking the victim. She was unaware of any injury to the victim, and she never saw the child dropped. The Defendant later told her he had sneezed, blacked out, and dropped the victim. She agreed that she left with the Defendant after she gave her statement to Collingsworth, but she said she had nowhere else to go until DCS found her an opening in a shelter. She said her mother and father had custody of the victim.

On cross-examination, Ms. Trehern testified that no one had asked whether someone other than the Defendant had tended the victim until DCS questioned her at the Johnson City Medical Center. She said that after her meeting with Collingsworth, she asked the Defendant to tell her if he had done anything. She had testified during a May 17, 2008 hearing in juvenile court that the Defendant had never shaken the victim. She had not had any contact with the Defendant since he had been charged with the offenses in this case. She acknowledged that she suffered from bipolar disorder, and she said that her moods fluctuated "really quickly." She said she was treated with Zoloft and had been hospitalized three times for the illness.

Teddy Collingsworth, a criminal investigator with the district attorney general's office, testified that he specialized in child abuse investigations. He was contacted by Donna Spencer with DCS on April 25, 2007. He attended an interview with the Defendant and Ms. Trehern the next day. He interviewed Trehern first, reduced her statement to writing, and gave her an opportunity to review it. He made some corrections, read the statement to her, and allowed her to read it. He had her initial the mistakes. Ms. Trehern's statement specified:

> Investigator Teddy Collingsworth with the . . . District Attorney's office . . . told me that I wasn't under arrest and that I could get up and leave at any time. I give this statement freely and voluntarily.
>
> I have known [the Defendant] for approximately three years. We have two children together, [T.T.] 22 months and [the victim] four months. [The Defendant] and I were married 12-18-2004 and divorced 11-18-2006. We lived in Brewton,

Alabama. [T.T.] was three years old and he had three broken ribs. [The Defendant] admitted that he hugged him and broke the ribs after [T.T.] was crying and he picked him up to comfort him.

After moving to Rogersville, Tennessee, I let [the Defendant] come back to live with us, trying to work things out. I was working in Greeneville and [the Defendant] was baby-sitting. Then I got a job at Save-A-Lot in Rogersville[.] [The Defendant] was still watching the kids while I worked. On April the 9th, 2007, we took [the victim] to Dr. Giles office in Greeneville because she . . . wasn't eating well. Then during that week [the victim] was crying and [the Defendant] got upset and picked her up and shook her hard and I got her from him. [The Defendant] really loses his temper a lot when the children cr[y]. He calls [the victim] a b[----] when she cries a lot. Then on April 16, 2007 I had [the Defendant] to take the [the victim] back to Dr. Giles because all [the victim] was doing was sleeping and not eating. Dr. Giles did some tests and they came back normal. Then on Wednesday April 18, [the victim] had a seizure and I took her to W[el]lmont ER in Rogersville and she got out of the hospital on Thursday evening. Then on Saturday morning [the Defendant] came to work and got me, that [the victim] had another seizure and we took her back to the ER. And they transferred [the victim] to JCMC in Johnson City. When I caught [the Defendant] shaking [the victim] that day I had walked into the bedroom and it was when I came out that was when I saw him shaking her I don't know how long he had been shaking her. [The victim] had been crying a while before I come [sic] out of the bedroom. After the Doctor told me about the serious injuries that [the victim] had I knew in the back of my mind what caused the injuries. But, I was afraid to tell because I personally know what [the Defendant] can do when he gets mad. Sometimes [the victim] will be crying and when [the Defendant] goes to check on her she will cry a lot louder and I will ask [the Defendant] what did you do to her. He will say nothing.

Investigator Collingsworth testified that he and the DCS agent witnessed Ms. Trehern sign the statement. He next talked to the Defendant. The Defendant said he did not shake

-6-

the victim but admitted that he got upset when the victim cried. Collingsworth reduced the victim's statement to writing and the Defendant signed it. In it, the Defendant said:

> I moved back to my ex-wife, Michelle Trehern, the first of March 2007. I don't know the exact day. Michelle was working in Greeneville at T.I. Automotives; then Michelle got a job at Save-A-Lot in Rogersville. I was watching [T.T.], date of birth 6-6-05, and [the victim], date of birth 12-20-06, while Michelle was working.
>
> I took [the victim] to Dr. Giles in Greeneville about two weeks ago because Michelle was working. [The victim] was sleeping all of the time and not eating. Dr. Giles did some tests, but they came back normal. Then Michelle took [the victim] to the E.R. because [the victim] was having seizures last Wednesday. [The victim] was released the next day that evening. Then this past Saturday [the victim] had another seizure, and I went to Michelle's work and we took her to the E.R. in Rogersville and she was transferred to Johnson City Medical Center.
>
> When [the victim] cries it upsets me sometimes, but I have never shook [sic] her. I call [the victim] a bitch sometimes when she cries because I don't think nothing [sic] is wrong with her. Her mother calls her a bitch, too. I never get too upset that I don't remember what I do. When [T.T.] was four months old he would cry and I would get upset and it would upset me, and one time I picked him up and hugged him and broke five ribs. This was in Alabama. I do better since I went to anger management classes. I would never hurt [the victim]. I have never shook [the victim]. [T.T.] shakes [the victim] when she is in the bouncer seat and car seat. If I had done something to [the victim], I would admit it. If I did, I would tell her I'm sorry.

Investigator Collingsworth was contacted at 6:30 that evening. The Defendant had returned to the office and had asked to see him. The Defendant said he had not been truthful in his first statement. The Defendant gave a second statement to Collingsworth in which he stated:

> I came to the Hawkins County Sheriff's Department and

talked with Deputy Daniel Byington and told him I had talked to Investigator Teddy Collingsworth with the District Attorney's Office earlier today and hadn't told him everything, that I wanted to talk to [him]. At 7:15 Investigator Collingsworth told me that I wasn't under arrest and that I could get up and leave at any time. I give this statement freely and voluntarily.

Today when I talked with you I didn't tell you the truth. I caused the injuries to [the victim]. The week of April the 9th through the 16th I had [the victim] up over my head, playing with her and she was laughing. I got dizzy and lost sight and dropped [the victim], and before she hit the floor I got my sight back and she hit the floor on her back. I don't know if her butt or head hit the floor first. I didn't tell anybody or Michelle that I had dropped her. The doctors didn't ask me at the Johnson City Medical Center what happened to [the victim] to cause the injuries because I wasn't there much. This is the whole truth. I hugged my son, [T.T.], too tight, not knowing my strength, to cause the broken ribs. I lose vision when I sneeze and I sneezed the day I dropped [the victim].

On cross-examination, Investigator Collingsworth testified that he did not record the statements. At the time he interviewed Ms. Trehern, he had been told that the victim had a skull fracture and a rib fracture in addition to the subdural hematomas. He said that authorities in Alabama had conducted a nine-month investigation of the Defendant and the incident involving T.T. but that no charges were ever filed. He said that the Defendant was about six feet and two inches tall and that the ceilings of the trailer in which the Defendant lived were not high enough to allow the Defendant to stand and hold the victim overhead.

On redirect examination, Investigator Collingsworth demonstrated how Ms. Trehern described the Defendant's shaking the baby. He held his hands approximately eight or ten inches apart and moved them back and forth in front of his face.

Dr. Mary Ann Neal, a pediatric radiologist, testified that she reviewed multiple x-rays and scans of the victim. The victim had a left parietal skull fracture and subdural hematomas of different ages on each side of the brain. On an initial skeletal survey, there was a question about a possible rib fracture, but subsequent x-rays were negative. Using the April 21, 2007 CT scan and an April 25, 2007 MRI, Dr. Neal described an acute area of bleeding on the left side of the brain and an older area of bleeding on the right side. The victim's brain had been pushed inward from the mass effect of the bleeding. She estimated the age of the left parietal

hemorrhage as between one and ten days old as of April 21. She estimated the right parietal hemorrhage as older than ten days. She said the skull fracture occurred between ten days and three months before the CT scan. Dr. Neal said that based upon a reasonable degree of medical certainty, the subdural hematomas and skull fracture were consistent with neurological dysfunction. She said that absent a severe motor vehicle collision, the victim's injuries were consistent with non-accidental trauma.

On cross-examination, Dr. Neal testified that there might be other causes for a child to experience neurological problems. A fall from a significant height of six feet would cause cerebral hemorrhaging. Bruising was not always present in shaken baby syndrome. Lethargy, retinal hemorrhaging, and non-reactive pupils could also be symptoms of shaken baby syndrome. She said that bulging fontanels were not something that could be detected on the scans but that someone examining the victim would be able to feel them. The skull fracture could have occurred as a result of a fall from a height of six feet. She also said that the skull fracture occurred at the time of one of the hemorrhages. She did not agree that the injury to the right side of the skull dated to the time of the victim's birth, but she said that the injury could have occurred in January or February.

Dr. Jeff Carlsen testified that he was a pediatric ophthalmologist who examined the victim. He said he detected hemorrhages in three quadrants in the victim's left eye. Based upon a reasonable degree of medical certainty, his opinion was that the retinal hemorrhages were consistent with non-accidental trauma. He said the trauma in this case was a acceleration-deceleration injury, or shaken baby syndrome.

On cross-examination. Dr. Carlsen testified that bruising was not necessarily found in shaken baby syndrome. He said a major percentage of children who suffered shaken baby syndrome had major central nervous system injury. He said that the victim's eye injury was mild to moderate. He would not presume that hemorrhaging would occur in both of the victim's eyes because hemorrhaging in both eyes did not occur in twenty-five to thirty percent of shaken baby cases. He also said that non-reactive pupils were not necessarily common in a shaken baby case and that in all the cases in which he had been involved, only one child had non-reactive pupils.

Dr. Ricky Mohon testified that he was the Director of the Pediatric Critical Care Unit at Johnson City Medical Center and an Associate Professor in the Department of Pediatrics at Quillen College of Medicine at East Tennessee State University. He first saw the victim on April 22, 2007, when she was transferred from another hospital. The victim's history was that she had been a normal three-month old baby until two weeks before he saw her. Nothing suggested the family was aware of anything that had caused the victim's injuries. The victim was hospitalized for about seventeen days. The victim had an EEG to detect seizures and

was started on seizure medications. He said his diagnosis was a history of seizures and bilateral subdural effusions with the possibility of non-accidental trauma. He said he ruled out other causes of the bleeding. In his opinion, the bleeding injuries were caused by shaken baby syndrome and the skull fracture was caused by blunt force trauma, such as striking a wall or a floor. He said that the victim suffered serious bodily injury and that the subdural effusions could cause permanent brain damage and seizures. The victim had to have procedures to drain the blood from her head.

On cross-examination, Dr. Mohon testified that, ultimately, the victim had no rib fractures. He said that hairline fractures, chip fractures, and some of the findings in shaken baby syndrome are subtle changes that a radiologist might not have much experience in detecting. It would be unusual to have rib fractures in an infant because infants' chests are very flexible. Bruising did not necessarily indicate abuse or the severity of abuse, nor did the lack of bruising indicate no abuse. He did not notice any bruising on the victim. A retinal hemorrhage could cause permanent damage and blindness, and retinal hemorrhaging could occur during birth, during an automobile accident, or as the result of a fall. However, retinal hemorrhages caused by birth would resolve quickly and would not be present in a three-month-old baby. He had never seen a retinal hemorrhage in a child as the result of a fall from a parent's arms, but a fall from six to eight feet could cause cerebral hemorrhage. He said that non-reactive pupils resulted from significant injury but that reactive pupils did not negate a diagnosis of severe abuse. Lethargy was not necessarily a typical finding in shaken baby syndrome because a child's symptoms depended upon the severity of the injury and on the particular patient. It was possible for a shaken baby to be active and alert if the injury was not severe enough to affect mental status. He said that the victim probably had a seizure disorder and that the subdural effusions and retinal hemorrhages were significant injuries. He was unable to say whether that trauma would cause permanent, irreparable brain damage. During the victim's hospitalization, she experienced vomiting, feeding problems, and aspiration problems, and Dr. Mohon attributed these complications to brain damage. He said the skull fracture indicated with a medical certainty that the victim had suffered a traumatic event. He said that without any history of trauma, the only diagnosis was non-accidental trauma. He said that after learning the extent of injuries, some parents would fabricate an event to explain how the injuries occurred but that the scenarios they fabricated would not be severe enough to explain the injuries. He agreed that dropping a baby from six feet onto a concrete slab could cause a skull fracture and retinal hemorrhaging. The patient history compiled by the resident physician, Dr. Stansberry, reflected that the victim had been watched by neighbors.

Donna Spencer testified for the defense that she was a child protective services investigator with DCS. She spoke with Michelle Trehern on April 25, 2007. Ms. Trehern asked whether DCS would give custody of the victim to the Defendant if she admitted that

she committed the abuse. Ms. Spencer reported Trehern's statement to the district attorney general.

On cross-examination, Ms. Spencer testified that she was present when Ms. Trehern gave her statement to Investigator Collingsworth. She heard Trehern say every word that was contained in the statement. She saw Trehern sign the statement, and she signed it also. Her impression was that Trehern was trying to take the blame for the Defendant.

Investigator Collinsgworth was recalled by the defense and testified that Ms. Trehern did not report that neighbors sometimes babysat the victim. He had reviewed the testimony from a juvenile court hearing in which she had testified that her neighbors watched her children. He said he did not see the doctor's report that reflected that neighbors had babysat the children until months after he interviewed Trehern. He agreed that he had not attempted to determine the names of the neighbors and what contact they might have had with the children. He said Trehern did not inform him that she suffered from bipolar disorder, that she was taking medication, or that she had been hospitalized three times for the disorder.

Betty Gorman, the victim's maternal grandmother, testified that she had physical and legal custody of the victim and the victim's older brother. The victim had been "back and forth" to doctors for follow-up care and had begun experiencing seizure activity in July 2008. The victim's eyesight appeared to be fine, and the victim was developing normally for her age, except for a slight laxity in her speech.

The State elected for count one of aggravated child abuse to involve the left subdural hematoma suffered by the victim one to ten days before April 21, 2007, for count two to involve the right subdural hematoma suffered by the victim between April 9 and April 16, 2007, and for count three to involve the skull fracture suffered by the victim between January 9 and April 9, 2007. The jury found the Defendant guilty of counts one and two but acquitted the Defendant of count three.

## I

The Defendant contends that the evidence is insufficient to support his convictions for aggravated child abuse. The State contends that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh

the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As pertinent to this appeal, a person commits aggravated child abuse when he or she

> commits the offense of child abuse, as defined in § 39-15-401(a)
> . . . and:
>
> > (1) The act of abuse or neglect results in serious
> > bodily injury to the child; . . . .

T.C.A. § 39-15-402 (2006). Child abuse is "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury . . . ." Id. § 39-15-401. When a child is less than eight years of age, the violation of Code section 39-15-402 is a Class A felony. Id. § 39-15-402(b).

Taken in the light most favorable to the State, Michelle Trehern gave a statement to Investigator Collingsworth that she saw the Defendant shake the victim. Dr. Giles testified that the victim presented symptoms indicating a failure to thrive and that Trehern had reported seizure-like symptoms. Dr. Landis observed no bruising or signs of abuse. Dr. Sleeter testified that he ordered a CT scan and that the initial readings showed large collections of blood on both sides of the victim's brain. He testified that one of the areas of blood showed decreased density, meaning that it was older. Dr. Gash testified that the April 21, 2007 head CT showed an abnormal hyperdensity, representing blood, and that the victim had an acute cerebral interspheric hemorrhage and a chronic area of hemorrhage that had pushed the victim's brain away from her skull. He concluded that the victim's injuries were the result of non-accidental trauma, to which he referred as shaken baby syndrome. He said that it was unlikely that a three- or four-month old baby could, on her own, generate the acceleration-deceleration force necessary to cause the injury. He said that the victim had no external trauma and that there was no evidence of a severe motor vehicle accident, which might have produced the same types of injuries. Investigator Collingsworth and Donna Spencer testified that Michelle Trehern made a statement in which she said she caught the Defendant shaking the victim. Dr. Neal testified that the victim's injuries were consistent with shaken baby syndrome, that the left subdural hematoma had occurred within ten days of April 21, 2007, and that the right subdural hematoma had occurred sometime before that. Dr. Carlsen testified that the victim had hemorrhages in three quadrants of the left eye, consistent with non-accidental rapid acceleration-deceleration trauma, or shaken baby

syndrome. Dr. Mohan testified that the victim's subdural effusions were caused by shaken baby syndrome and that the skull fracture was caused by blunt trauma. He testified that the subdural effusions were serious injuries which could cause permanent, irreparable brain damage. In her April 26, 2007 statement, Ms. Trehern said that she saw the Defendant shake the victim. Although she testified at the trial that never saw the Defendant shake the victim, when asked if the victim had been crying before she caught the Defendant shaking the victim, she responded that the victim had been crying for a few minutes. We must presume that the jury resolved the conflicts in Ms. Trehern's testimony in favor of the State. We conclude that the evidence is sufficient to support the Defendant's convictions for aggravated child abuse. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends that the trial court erred in denying his motion to compel discovery of the victim's and the victim's brother's medical records dating from their birth. The State contends that the trial court properly denied the Defendant's motion to compel discovery of the medical records because the records were not in the State's custody or control. We agree with the State.

The Defendant sought to obtain the children's medical records dating from their birth. At the hearing on the motion to compel discovery, the Defendant contended that the victim had suffered seizures before the Defendant lived in Tennessee and that the victim continued to suffer seizures after the injuries that are the subject of this appeal. He said that the victim's mother, Ms. Trehern, had stated in a deposition that the victim's older brother also had seizures. He argued that the State had access to Trehern, that Trehern knew where the victim had been born and had received medical care before the Defendant began living with her, and that the records were discoverable material. He argued that Trehern was the State's witness, and as such, the records that she could obtain were within the State's control. The State responded that it did not have in its possession any of the victim's medical records for the time period before the victim's treatment for the aggravated child abuse. It stated that the victim's medical records from her treatment arising from the aggravated child abuse had been provided to the defense pursuant to the discovery request. The State also said that Trehern was not under its control because she was represented by counsel who was present whenever the State tried to talk with her. The district attorney general said that the State was having difficulty communicating with Trehern.

The trial court determined that the requested records were not within the State's control and denied the Defendant's motion to compel discovery. However, the trial court ordered the State to disclose the mother's contact information. The Defendant claims that

-13-

the contact information provided by the State reflected that Michelle Trehern lived in Rogersville, when in fact she had relocated to Greeneville.

Rule 16 of our Rules of Criminal Procedure provides in pertinent part:

(a) Disclosure of Evidence by the State. –

(1) Information Subject to Disclosure. –

. . .

(F) Documents and Objects. –Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or other places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

The State is not required to disclose evidence that is not in its actual or constructive possession. See State v. Hutchinson, 898 S.W.2d 161, 168 (Tenn. 1994). The State is also not required to disclose evidence that is available or accessible to a defendant or that could be obtained by exercising reasonable diligence. State v. Dickerson, 885 S.W.2d 90 (Tenn. Crim. App. 1993).

The Defendant has cited no proof to support his argument that the victim's or her brother's private medical records of treatment before the aggravated child abuse were within the State's control. The trial court in the case ordered the disclosure of Ms. Trehern's contact information, which was furnished.

The record reflects that the Defendant knew where to contact Dr. Giles. In his April 26, 2007 statement, the Defendant said that he had taken the victim to Dr. Giles's office in Greeneville. The record also reflects that the State filed a notice to add witnesses on February 29, 2008, and included Dr. Giles's name and employer. Dr. Giles's name was also on the indictments. In addition, Michelle Trehern's name and telephone number were listed on a notice to add witnesses filed on October 8, 2008. The Defendant could have issued subpoenas to Dr. Giles. The information was available to the Defendant through the exercise of reasonable diligence. The trial court did not err in denying the motion to compel. The Defendant is not entitled to relief on this issue.

### III

The Defendant contends that his sentences are excessive because the trial court misapplied enhancement factor (10), that the defendant showed no hesitation about committing a crime when the risk to human life was high, because the record does not show that he had "no hesitation." See T.C.A. § 40-35-114(10) (Supp. 2009). He notes the trial court's application of factor (14), that he abused a position of private trust, but he argues that the trial court was not justified in assigning it great weight and should have set against it in mitigation his "spotless" criminal record. The State contends that the trial court did not abuse its discretion by sentencing the Defendant to twenty years for each conviction for aggravated child abuse.

At the sentencing hearing, the trial court applied enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high, because the Defendant abused the victim more than once when there was a high risk of the four-month-old victim dying from serious injuries inflicted by abuse. See T.C.A. § 40-35-114(10). The court also found factor (14), that the Defendant abused a position of private trust, because the Defendant was the victim's father. See id. § 40-35-114(14). The court found no mitigating factors and ordered the Defendant to serve concurrent twenty-year sentences in the Department of Correction.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

> > (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> > (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set

-16-

out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210.  Aggravated child abuse as charged in this case is a Class A felony with an applicable sentencing range of fifteen to twenty-five years.  T.C.A. §§ 39-15-402(b), 40-35-112(a)(1).

The record reflects that the court based its finding of factor (10) on Dr. Mohon's testimony that the risk of serious injury and death was high in victims of shaken baby syndrome and on the victim's young age of three to four months old at the time of the abuse. The offense of aggravated child abuse required the State to prove that the victim suffered serious bodily injury.  See T.C.A. § 39-15-402(a)(1).  Enhancement factor (10), risk to human life, is not an element of aggravated child abuse because the State may prove serious bodily injury without proving risk to life.  See State v. Jones, 883 S.W.2d 597, 602-603 (Tenn. 1994); T.C.A. § 39-15-402(a)(1).  Therefore, factor (10) is applicable to the Defendant's convictions.  In addition, the court assigned great weight to factor (14), that the Defendant abused a position of private trust, because the Defendant committed aggravated child abuse of his infant daughter.  Factor (14) is also applicable.

The trial court considered and rejected the statutory mitigating factors.  See T.C.A. § 40-35-113.  The court also noted the Defendant's lack of criminal history but did not apply it in mitigation.  The court stated that although the Defendant had "lived a fairly law abiding life[,]" the Defendant had problems controlling his temper, which had resulted in the child abuse.  The 2005 Amendments to the Sentencing Act "increase the amount of discretion a trial court exercises when imposing a sentencing term."  Carter, 254 S.W.3d at 344.  The trial court was required to consider, but was not bound by, the statutory enhancement and mitigating factors.  See T.C.A. § 40-35-210(c)(2); Carter, 254 S.W.3d at 344.  Mitigating factors include those enumerated in Code section 40-35-113, and any factor consistent with the purposes of the Sentencing Act, such as a lack of criminal history.  See T.C.A. § 40-35-113(13).  Therefore, the trial court was required to consider, but was not required to apply, the Defendant's lack of criminal history in mitigation.

The record reflects that the trial court considered the purposes and principles of the sentencing act and determined that confinement was necessary to avoid depreciating the seriousness of offense and as a deterrent to others likely to commit similar offenses.  The Defendant has failed to overcome the presumption that the trial court's sentencing determinations were correct.  He is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE